**05-60584**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COURT-APPOINTED RECEIVER OF
LANCER MANAGEMENT GROUP LLC,
LANCER MANAGEMENT GROUP II LLC,
LANCER OFFSHORE INC.,
OMNIFUND LTD., LSPV INC.,
LSPV LLC, ALPHA OMEGA GROUP INC.,
and G.H. ASSOCIATES LLC, and
RESPONSIBLE PERSON OF LANCER
PARTNERS, L.P.,

       Plaintiff,

vs.

MICHAEL LAUER; MARTIN GARVEY; ERIC
HAUSER; DAVID NEWMAN; MILTON
BARBAROSH; GEORGE LEVIE; STENTON
LEIGH CAPITAL CORPORATION; KATHRYN
COWEN a/k/a KATHRYN BRAITHWAITE;
STERLING TECHNOLOGY PARTNERS; JAMES
KELLY; JOSEPH HUARD; SHAMROCK
PARTNERS LTD.; CAPITAL RESEARCH LTD.;
LAURENCE ISAACSON; L. ISAACSON, INC.;
THORNHILL GROUP, INC.; ROBERT MAUM;
JAMES RAKER; HEIDI CARENS; JUDITH
BRISMAN

       Defendants.

_____/

CIV-DIMITROULEAS

Case No.

/TORRES



## COMPLAINT

Plaintiff Marty Steinberg, Esq., court-appointed receiver of Lancer Management Group

LLC, Lancer Management Group II LLC, Lancer Offshore Inc., Omnifund Ltd., LSPV Inc.,

LSPV LLC, Alpha Omega Group Inc., and G.H. Associates LLC (collectively the "Receivership

Entities") and responsible person for Lancer Partners L.P. ("Partners"), through undersigned

counsel, sues Michael Lauer, Martin Garvey, Eric Hauser, Milton Barbarosh, George Levie,

Stenton Leigh Capital Corporation, Kathryn Cowen a/k/a Kathryn Braithwaite, Capital Research Ltd., Sterling Technology Partners, James Kelly, Joseph Huard, Shamrock Partners, Ltd., Laurence Isaacson, L. Isaacson, Inc., Thornhill Group, Inc., Robert Maum, Heidi Carens and Judith Brisman, and demands trial by jury of all issues triable as of right by a jury and alleges upon information and belief:

# I.
# PARTIES

## A.    THE RECEIVER

1.    The Receiver is an individual resident of the Southern District of Florida by virtue of his appointment as receiver by this Court.

2.    On July 10, 2003, this Court entered an Order Appointing the Receiver as receiver (the "Receivership Order") for Lancer Management Group LLC ("Lancer Management"), Lancer Management Group II LLC ("Lancer Management II")[1], Lancer Offshore Inc. ("Offshore"), Omnifund Ltd. ("Omnifund"), LSPV Inc. ("Offshore LSPV"), and LSPV LLC (Partners LSPV").[2]

3.    The Receivership Order empowers the Receiver to bring this action on behalf of the Original Receivership Entities.

4.    On July 24, 2003, the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court") entered an Order (the "July 24 Order")

---

[1] The Receiver shall hereinafter refer to Lancer Management and Lancer Management II together as the "Management Companies."

[2] The Receiver shall hereinafter refer to Lancer Management, Lancer Management II, Offshore, Omnifund, Offshore LSPV, and Partners LSPV collectively as the "Original Receivership Entities."  The Receiver shall hereinafter refer to Offshore, Omnifund, Partners, Offshore LSPV and Partners LSPV collectively as the "Funds."

recognizing the Receiver as responsible person for Lancer Partners L.P. ("Partners") by virtue of the Receiver's control of Lancer Management II, Partners' general partner.

5.      The July 24 Order empowers the Receiver to bring this action on behalf of Partners.

6.      On September 3, 2003, this Court entered an Order (the "Order Extending Receivership") extending the terms of the Order Appointing Receiver to include Alpha Omega Group Inc. ("Alpha Omega") and G.H. Associates LLC ("GH").

7.      The Order Extending Receivership empowers the Receiver to bring this action on behalf of Alpha Omega and GH.

**B.      THE INVESTMENT MANAGER**

8.      Michael Lauer ("Lauer") is an individual resident of Greenwich, Connecticut.

9.      At all relevant times, Lauer was the founder, manager and principal owner of the Management Companies and the *de facto* manager of the Funds.

**C.      THE GIRLFRIENDS**

10.     Heidi Carens ("Carens") is an individual resident of Greenwich, Connecticut.

11.     Carens is Lauer's live-in girlfriend and the mother of three of his five children.

12.     Judith Brisman ("Brisman")[3] is an individual residing of New York, New York.

13.     Brisman was Lauer's girlfriend and is the mother of two of his five children.

**D.      THE OFFICERS AND EMPLOYEES**

14.     Martin Garvey ("Garvey") is an individual resident of Essex Fells, NJ.

15.     Garvey served as an officer of the Management Companies and the Funds.

16.     Eric Hauser ("Hauser") is an individual resident of New York, NY.

---

[3] The Receiver shall hereinafter refer to Carens and Brisman as the "Girlfriends."

17.   Hauser served as an officer of the Management Companies and the Funds.

18.   David Newman ("Newman")[4] is an individual resident of New Jersey.

19.   Newman was an employee of GH.

**E.    THE "FINDERS" AND "CONSULTANTS"**

20.   Kathryn Cowen a/k/a Kathryn Braithwaite ("Braithwaite") is an individual resident of San Clemente, CA.

21.   Braithwaite is the wife of Bruce Cowen ("Cowen").

22.   Sterling Technology Partners, Ltd. ("Sterling") is a California limited partnership that purportedly provided financial services to the Funds.

23.   Cowen was the sole equity partner of Sterling.

24.   James Kelly ("Kelly") is an individual resident of Newton Square, PA.

25.   Joseph Huard ("Huard") is an individual resident of Lake Worth, FL.

26.   Shamrock Partners, Ltd. ("Shamrock") is a Pennsylvania limited partnership that purportedly provided financial services to the Funds.

27.   Kelly was the sole equity partner of Shamrock.  Huard was an employee of Shamrock.

28.   Capital Research, Ltd. ("Capital Research") is a Pennsylvania limited partnership that purportedly provided financial services to the Funds.

29.   Cowen, Kelly and Garvey held a 25% equity stake in Capital Research.

30.   Lauer also owned a fourth equal share in Capital Research through Alpha Omega.

31.   Laurence Isaacson ("Isaacson") is an individual resident of Weston, FL.

---

[4] The Receiver shall hereinafter refer to Garvey, Hauser and Newman as the "Officers and Employees."

32.     L. Isaacson, Inc. ("LII") is a Florida corporation that purportedly provided financial services to the Funds.

33.     Isaacson was the sole shareholder of LII.

34.     Thornhill Group, Inc. ("Thornhill")[5] is a Weston, FL corporation that purportedly provided financial services to the Funds.

35.     Isaacson was the sole shareholder of Thornhill.

36.     Robert Maum ("Maum") is an individual resident of Greenwich, CT.

37.     At relevant times hereto, Maum was the president and chief executive officer of Fidelity First Financial Corp.

38.     James Raker ("Raker") is an individual resident of New York, NY.

39.     At relevant times hereto, Raker was the executive vice president and chief financial officer of Fidelity First Financial Corp.

**F.      THE VALUATION SHILLS**

40.     Milton Barbarosh ("Barbarosh") is an individual resident of Boca Raton, FL.

41.     George Levie ("Levie") is an individual resident of Plantation, FL.

42.     Stenton Leigh Corporation ("Stenton Leigh")[6] is a Florida corporation that purportedly provided valuation services to the Funds.

## JURISDICTION AND VENUE

43.     This Court has original subject matter jurisdiction over all claims at issue in this Proceeding pursuant to 28 U.S.C. § 1331.

---

[5] The Receiver shall hereinafter refer to Cowen, Braithwaite, Sterling, Kelly, Huard, Shamrock, Capital Research, Maum, Isaacson, LII and Thornhill as the "Finders and Consultants."

[6] The Receiver shall hereinafter refer to Barbarosh, Levie and Stenton Leigh as the "Valuation Shills." The Receiver shall hereinafter refer to the Girlfriends, the Officers and Employees, the Finders and Consultants, and the Valuation Shills collectively as the "Co-Conspirators."

44.     Additionally, this Court has original subject matter jurisdiction over all claims at issue in this action pursuant to 15 U.S.C. § 78aa.

45.     Further, this Court has ancillary and/or supplemental jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. § 1367.

46.     Finally, this Court has subject matter jurisdiction over all claims asserted by Partners pursuant to 28 U.S.C. §§ 157 and 1334.

47.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 754 and 1692.

48.     This Court further has general personal jurisdiction over the Defendants pursuant to under Florida Statutes § 48.193(2) by virtue of the Defendants' substantial, continuous and not isolated contacts with Florida.

49.     Alternatively, this Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1) due to the fact that all claims at issue in this action arise from the Defendants' operation of a business venture in Florida, the Defendants' commission of tortious acts in Florida, and/or the Defendants' causing of injury to persons and property in Florida while engaged in solicitation and service activities in Florida.

50.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

51.     Additionally, venue is proper in this Court pursuant to 28 U.S.C. §§ 754 and 1692.

52.     Finally, venue is proper in this Court for all claims asserted by Partners pursuant to 28 U.S.C. § 1409.

## II.
## GENERAL ALLEGATIONS

### A.     FORMATION AND ORGANIZATION OF THE FUNDS

53. In 1993, Lauer formed a New York limited partnership that he eventually named Lancer Partners L.P. ("Partners New York").

54. In November 1997, Lauer formed Partners as a limited partnership under the laws of the State of Connecticut.

55. Lauer subsequently merged Partners New York into Partners.

56. Investors deposited approximately $196,198,334 in Partners since its inception.

57. On September 27, 1995, Lauer caused Offshore to be incorporated as an International Business Company ("IBC") under the laws of the British Virgin Islands (the "BVI").

58. On September 27, 1995, Offshore filed its Memorandum of Association and Articles of Association (the "Offshore Articles") in the BVI.

59. Offshore is the largest of the Funds.

60. Investors deposited approximately $906,000,000 in Offshore between September 27, 1995 and July 10, 2003.

61. On January 29, 1999, Lauer incorporated the Orbiter Fund, Ltd. ("Orbiter") as an IBC in the BVI.

62. On September 30, 1999, Lauer incorporated The Viator Fund ("Viator") as an IBC in the BVI.

63. On April 2, 2002, Lauer formed Omnifund as an IBC in the BVI by merging Orbiter and Viator[7].

64. On April 2, 2002, Omnifund filed its Memorandum of Association and Articles of Association (the "Omnifund Articles") in the BVI.

---

[7] The Receiver shall hereinafter use the term "Omnifund" to include Omnifund, Orbiter, and Viator collectively.

65.    Investors deposited approximately $48,632,450 in Omnifund between January 29, 1999 and July 10, 2003.

66.    The Funds are hedge funds.

67.    The Funds operated as open-end investment funds.

68.    In such funds, investors purchase and redeem shares at a set figure called the net asset value per share ("NAV/share").

69.    The "net asset value" of each of the Funds refers to the total value of all of the securities held by each of the Funds.

70.    Unlike ordinary public companies, open-end investment funds' share prices do not fluctuate based on the supply and demand for the Funds' shares.

71.    In calculating an open-end investment fund's NAV/share, an investment manager calculates the total NAV of the fund's portfolio of securities on the date of the calculation and divides that total NAV by the number of shares the fund has issued to investors.

72.    The Funds' share price was based solely on the Funds' NAV/share.

73.    The Funds paid management and incentive fees to Lauer, Garvey and Hauser through the Management Companies, ostensibly for the use of their expertise in selecting investment positions for Offshore and Omnifund.

74.    On November 24, 1997, Partners entered a Limited Partnership Agreement with Lancer II (the "Partnership Agreement").

75.    The Partnership Agreement provides that Lancer Management II shall be Partners' general partner.

76.     The Partnership Agreement also provides that Partners shall pay Lancer Management II (i.e., Lauer, Garvey and Hauser), a management fee of approximately 1% per year, calculated by multiplying Partners' NAV at the end of each fiscal quarter by 0.25%.[8]

77.     The Partnership Agreement further provides that Partners shall pay Lancer Management II an incentive fee equal to 20% of the net profits of Partners, including any unrealized gain, as calculated on the last day of Partners' fiscal year.

78.     On January 1, 1998, Offshore and Lancer Management entered an Amended and Restated Investment Management Agreement with Lancer Management (the "Offshore Management Agreement").

79.     The Offshore Management Agreement provides that Lauer, through Lancer Management, would serve as Offshore's investment manager.

80.     The Offshore Management Agreement also provides that Offshore shall pay Lauer, Garvey and Hauser through Lancer Management, a management fee of approximately 1% per year, calculated by multiplying Offshore's NAV at the beginning of each fiscal quarter by 0.25%.

81.     The Offshore Management Agreement further provides that Offshore shall pay Lauer, Garvey and Hauser, through Lancer Management, an incentive fee equal to 20% of the net profits of Offshore, including any unrealized gain, as calculated on the last day of Offshore's fiscal year.

82.     On or about March 27, 2002, Omnifund entered an Investment Management Agreement with Lancer (the "Omnifund Management Agreement")[9].

---

[8] Prior to November, 1997, management fees were paid directly to Lauer rather than through the Lancer Management II.

83.     The Omnifund Management Agreement provides that Lauer, through Lancer Management, would serve as Omnifund's investment manager.

84.     The Omnifund Management Agreement also provides that Omnifund shall pay Lauer, Garvey and Hauser, through Lancer Management, a management fee of approximately 2% per year, calculated by multiplying Offshore's NAV at the beginning of each fiscal quarter by 0.5%.

85.     The Omnifund Management Agreement further provides that Omnifund shall pay Lauer, through Lancer Management, an incentive fee equal to 25% of the net profits of Omnifund, including any unrealized gain, as calculated on the last day of Omnifund's fiscal year.

86.     Prior to the formation of Omnifund, Lancer Management's fee for managing Orbiter was approximately 1.5% per year, and was calculated by multiplying Orbiter's NAV at the beginning of each fiscal quarter by 0.375%.

87.     Lauer is the manager of the Management Companies.

88.     Lauer holds an 80% membership interest in each of the Management companies.

89.     Garvey and Hauser each hold a 10% membership interest in each of the Management Companies.

90.     Lauer, Garvey and Hauser, through Lancer Management, also received an incentive fee equal to 50% of the net profits of Orbiter, including any unrealized gain, as calculated on the last day of Orbiter's fiscal year.

---

[9] The Receiver shall hereinafter refer to the Partnership Agreement, the Offshore Management Agreement, and the Omnifund Management Agreement together as the "Management Agreements.

91.     Prior to the formation of Omnifund, Lancer Management's fee for managing Viator was approximately 1% per year, and was calculated by multiplying Viator's NAV at the beginning of each fiscal quarter by 0.25%.

92.     Lauer, Garvey and Hauser, through Lancer Management, also received an incentive fee equal to 25% of the net profits of Viator, including any unrealized gain, as calculated on the last day of Viator's fiscal year.

93.     This fee structure gave Lauer, Garvey and Hauser the incentive to raise the Funds' stated NAV at the end of each of the Funds' fiscal quarters and at year-end - when fees would be calculated.  The greater the NAV of the Funds, the greater management fees would be; the higher the profits, the higher the incentive fees.  Furthermore, by raising the NAV's, Lauer could market the Funds to potential investors as more substantial and profitable, and encourage investors to keep their money with the Funds, instead of redeeming.

### III.
### THE DUTIES OF THE INVESTMENT MANAGER AND THE OFFICERS

**A.      DUTY TO INVEST IN SECURITIES IN ACCORDANCE WITH STATED INVESTMENT STRATEGIES**

94.     The Management Agreements and applicable law obligated Lauer to choose the securities in which the Funds invested in accordance with the investment strategies and limitations represented to investors.

95.     The Funds solicited investors through, among other means, the issuance of private placement memoranda ("PPM's") which described the Funds' investment strategies and limitations.

96.    The PPM issued by Partners (the "Partners PPM") describes Partners' investment objective as seeking "high economic return primarily through capital appreciation while attempting to control risk."

97.    The Partners PPM provides for certain investment restrictions for Partners, namely that "[t]he Limited Partners, by pooling their assets in the Partnership, will be able to invest their funds in a diversified portfolio of securities managed by the General Partner that is seeking to maximize return while controlling risk."

98.    The PPM issued by Offshore (the "Offshore PPM") describes Offshore's investment objective as "an analytical discipline concentrating on underlying corporate value with an added emphasis on anticipatory timing of future corporate developments, primarily in small and middle capitalized companies."

99.    The Offshore PPM provides for certain investment restrictions for Offshore, namely (a) that no more than 20% of the gross NAV of the Fund may be lent to or invested in the securities of one issuer, and (b) that Offshore may not take or seek to take legal or management control of the issuer of any of its underlying investments.

### B.    DUTY TO VALUE SECURITIES FAIRLY

100.    Because investors purchased and redeemed shares in the Funds based solely on the stated NAV of the Funds, and because the management and incentive fees due Lauer were also determined by the stated NAV of the Funds, another critical duty of the Lauer was to fairly value the securities held by the Funds.

101.    Investors themselves could not adequately monitor Lauer's valuation of the Funds' NAV's because Lauer did not share the identity of the Funds' holdings with the investors, allegedly due to fears over market reaction and adjustment to such information.

102.     The Partnership Agreement, the Offshore Articles and the Omnifund Articles accordingly provide rules for the calculation of the Funds' NAV's.

103.     The Partnership Agreement, the Offshore Articles and Omnifund Articles provide that the Funds would value securities in accordance with generally accepted accounting principles in force in the United States ("GAAP").

104.     The Partnership Agreement, the Offshore Articles and the Omnifund Articles further provide that if a security held by one of the Funds was listed on a national stock exchange - such as the New York Stock Exchange, the American Stock Exchange, or the NASDAQ exchange - then the value of the security would be determined by the securities' closing price on the last day of the period for which the NAV was being calculated.

105.     The Partnership Agreement, the Offshore Articles and the Omnifund Articles also provide that if a security held by one of the Funds was not listed on one of those exchanges, the board of directors of the particular fund would, in consultation with Lauer, determine the value at which the security should be carried.

106.     The Partnership Agreement, the Offshore Articles and the Omnifund Articles generally impose upon Lauer a duty to ascribe a "fair value" to the securities held by the Funds.

**C.     GENERAL DUTY OF CARE**

107.     In general Lauer was required to exercise his duties as investment manager with "care, skill, prudence and diligence."

**IV.**
**LAUER BREACHED HIS DUTIES WITH THE ASSISTANCE OF HIS CO-CONSPIRATORS**

**A.     GENERAL DESCRIPTION OF BREACHES**

108.    Starting as early as 1997, Lauer completely ignored his duties to the Funds and, along with the his Co-Conspirators, took advantage of his position as investment manager to maximize his fee income regardless of the effect on the Funds' assets.

109.    Lauer, with the assistance of the Co-Conspirators, acted to enrich himself and the Co-Conspirators to the detriment of the Funds.

110.    Rather than focusing investments in small to mid-cap stocks on national exchanges, as represented to investors, the Funds often invested in worthless shell companies with no value and no real prospects for growth.

111.    In contravention to the restrictions set forth in the PPMs, Lauer, in certain instances, concentrated over 20% of the Funds' stated NAV in any single security.

112.    Further, in contravention to the restrictions set forth in the PPM's, the Funds often impermissibly took *de jure* or actual management control over the securities in their portfolios.

113.    Lauer often caused these controlled companies to retain one of the Co-Conspirators as an officer or director and to pay such co-conspirator for their "services."

114.    Most importantly, Lauer systematically overstated the NAV of the Funds by hundreds of millions of dollars to inflate his management and incentive fees.

115.    Lauer, with the assistance of the Co-Conspirators, pumped up the purported value of the Funds' holdings.

116.    First, the Funds acquired large blocks of restricted stock in thinly traded companies, often paying only pennies per share.

117.    Then, Lauer and the Co-Conspirators would then make manipulative trades in an insignificant amount of the unrestricted, publicly traded stock of these companies.

118.    At the end of a fiscal quarter or year - when Lauer's management and incentive

fees were to be determined - Lauer, often with the assistance of the Co-Conspirators - would place orders for small numbers of shares in thinly traded companies held by the Funds at unjustified prices considerably higher than Lauer paid in the private transactions through which the Funds obtained the shares.

119.    Often this would be the only retail transaction in shares of the company during that day.

120.    The inflated price paid for these publicly traded shares would be reported by over-the-counter pricing services.

121.    Lauer would then use this "last trade price" manufactured by himself and the Co-Conspirators as the per-share value of the thinly-traded company's shares for the purpose of determining the Funds' NAV, notwithstanding that such trades could not possibly set a fair price for the shares.

122.    Lauer would project the manipulated value achieved by selling a token amount of shares at an inflated price onto *all* of the shares held by the Funds, notwithstanding that most of the shares held by the Funds in these companies were restricted and could not be sold on the public markets at the price manufactured by Lauer, if they could be sold at all.

123.    This manipulation greatly inflated the stated NAV of the Funds, thus resulting in inflated fees payable and/or due to Lauer through the Management Companies.

124.    Lauer also caused the Funds to pay out "consulting" and "referral" fees to certain individuals and entities, including himself and certain of the Co-Conspirators, in exchange for bringing in additional investors at the inflated NAV/share, or for finding shell corporations whose value Lauer could manipulate to inflate the Funds' NAV.

125.    Lauer further retained and paid the Valuation Shills to provide bogus appraisals of certain of the Funds' holdings in order to justify the arbitrarily inflated values ascribed to them by Lauer.

126.    Lauer finally used the Girlfriends to funnel assets out of the Funds and as proxies to protect his own individual wealth in the event the Securities and Exchange Commission (the "SEC"), the Department of Justice, or investors discovered the breaches of his duties to the Funds.

**B.    <u>BLATANT EXAMPLES OF BREACHES</u>**

127.    The following examples illustrate Lauer's abuse of his position as investment manager for the Funds and the role played by the Co-Conspirators in facilitating and profiting from Lauer's misconduct.

**1.    <u>Nu-D-Zine</u>**

128.    One of the entities in which the Funds invested was Nu-D-Zine Bedding & Bath, Inc. ("Nu-D-Zine").

129.    In December, 2000, Nu-D-Zine was effectively a shell corporation.

130.    During 2000, Nu-D-Zine had no operations, no revenues and total assets of only $354,128.

131.    Nu-D-Zine was a non-reporting company -- that is, a company that did not file reports with the Securities and Exchange Commission -- it did not file any publicly available financial information -- and it was not traded on a national stock exchange such as the NYSE, NASDAQ or AMEX.

132.    At that time, Braithwaite was the sole director of Nu-D-Zine, and Stenton Leigh served as "financial advisor" to Nu-D-Zine.

133.   On December 26, 2000, Cowen, Braithwaite's husband - and a person named in the Offshore PPM as making investment decisions for the Offshore Funds - sent the following message to Lauer and Garvey via facsimile:

To:  Michael Lauer                        From:  Bruce Cowen

                                          Date:  12/26/00

Re:  Purchase of Shell (NUDZ)            CC:    Martin Garvey

We signed a term sheet to purchase ~ 94.5% of NUDZ for $400,000. I'm pushing for a closing on Wednesday or Thursday.  Terms of the transaction are as follows:

| | |
|---|---|
| Name of Company: | Nu-D-Zine Bedding & Bath, Inc. |
| Pink Sheet Symbol: | NUDZ |
| Authorized Shares: | 50 million |
| Outstanding Shares: | 11,535,898 |
| Shares to be Purchased: | 10,900,000 |
| Remaining Float: | 635,898 |
| Inside Market: | $.155 bid        $.625 ask |
| Market Makers: | Alexander<br>Paragon<br>Herzog<br>Knight<br>Hill Thompson<br>Shamrock (I had them enter today on the bid) |
| Market Analysis: | Hill is on the offer at $.625, than [sic] the stock goes $1.05 by Paragon |
| Purchase Price Per Share: | $.0367 |
| Strategy: | 1.  Complete above purchase Wed/Thurs. |

2. Fund the Company with $300,000
   Friday and receive the
   following:

   30 million shares @ $.01
   20 million warrants @ $.03
   20 million warrants @ $.05

3. Move the offer or close year at
   $.625

4. *With stock closing at $.625,
   $700,000 investment has
   market value of $48,962,500.*

5. For each $.01 closing over 5/8 has
   impact of $809,000.

6. Also, determining if any of the
   remaining 635,898 remaining
   shares can be purchased
   in a block

Michael, I'm pushing hard to get this done this week and hope to be successful. We will do a reverse split in January, similar to SMX.

Regards,

Bruce

134.    In summary, Cowen sent Lauer and Garvey a message describing the proposed "strategy" to: (i) purchase 10,900,000 restricted shares of Nu-D-Zine, (representing approximately 94.5% of the outstanding shares of the company, or a controlling interest in contravention to the restrictions in the Offshore PPM), for a total of $400,000; (ii) thereafter, infuse $300,000 into the company for additional shares and warrants; and (iii) within a week, value the restricted stock at $.625/share so that the Funds' $700,000 investment in Nu-D-Zine restricted stock would be valued at $48,962,500 for the purpose of determining the Funds' NAV - and Lauer's management and incentive fees.

135.    Cowen's message recommends that this course of action take place in the last

week of December - the end of a fiscal quarter and year - and thus the exact time when the NAV created by Lauer would be used to calculate the management and incentive fees to be paid to Lauer through the Management Companies - of which Garvey also owns 10%.

136.   Braithwaite, Cowen, Lauer and Garvey then carried out the scheme almost precisely as described in Cowen's message.

137.   Stenton Leigh provided a valuation supporting Lauer's absurd overvaluation of Nu-D-Zine.

138.   On December 29, 2000, Braithwaite, as Nu-D-Zine's sole director, approved the company's issuance of 2.5 million shares to Capital Research, presumably as a fee for "finding" the Funds as purchasers Nu-D-Zine.

139.   As noted, Capital Research was owned by Cowen, Kelly, Garvey, and, through Alpha Omega, Lauer.

140.   The 2.5 million shares were a kickback to Lauer and the Co-Conspirators - a little extra reward on top of the inflated management and incentive fees due to Lauer for the last quarter of 2000 as a result of the manipulation of the Funds' worthless holdings in Nu-D-Zine.

141.   As of December 31, 2000, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of $51,329,445.  Offshore paid only $432,112.10 for these shares.  Thus, Lauer claimed $50,897,333 worth of unrealized gain on Offshore's holdings in Nu-D-Zine for 2000.

142.   As of December 31, 2000, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of $19,385,742.19.  Partners paid only $325,000 for these shares.  Thus, Lauer claimed $19,060,742.19 worth of unrealized gain on Partners' holdings in Nu-D-Zine for 2000.

143.    Lauer ascribed this value to Nu-D-Zine despite the fact that Nu-D-Zine had $354,128 in assets, no operations, and no revenues in the year 2000.

144.    As of December 31, 2001, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of $138,570,918.  Offshore paid only $1,281,709.85 total for these shares.  Thus, Lauer claimed $137,289,208.15 worth of unrealized gain on Offshore's holdings in Nu-D-Zine for 2001.

145.    As of December 31, 2001, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of $59,601,995.  Partners paid only $508,681 total for these shares.  Thus, Lauer claimed $59,093,314 worth of unrealized gain on Partners' holdings in Nu-D-Zine for 2001.

146.    As of December 31, 2002, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of $158,558,720.  Offshore paid only $1,312,320.03 total for these shares.  Thus, Lauer claimed $157,246,399.97 worth of unrealized gain on Offshore's holdings in Nu-D-Zine for 2002.

147.    As of December 31, 2002, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of $76,954,200.  Partners paid only $538,354.26 total for these shares.  Thus, Lauer claimed $76,415,845.74 worth of unrealized gain on Partners' holdings in Nu-D-Zine for 2002.

148.    The inflated valuations ascribed to Nu-D-Zine by Lauer - and approved by Levie in a conclusory and patently insufficient "appraisal" - fail to account for the actual state of Nu-D-Zine - now known as XtraCard Corp.  ("XtraCard") - throughout 2001 and 2002.

149.    According to Levie, as of December 31, 2002, XtraCard had only $1,866,600 in assets.

150.   According to Levie, for the year 2002 XtraCard only had $152,407 in revenue, compared with $1,944,509 in expenses - a net loss of $1,792,102.

## 2.   SMX Corporation

151.   Cowen's December 26, 2000 facsimile message, quoted above, also refers to the manipulation by Lauer, Cowen and Garvey of another worthless shell corporation - SMX Corporation ("SMX") - in order to inflate the Funds' NAV.

152.   SMX was essentially a shell corporation owned by Stenton Leigh.

153.   During 2000, SMX had no operations, no revenues and total assets of only $2,154,244, made up of only cash and a note receivable.

154.   Like Nu-D-Zine, SMX was a non-reporting company that did not file any publicly available financial information.

155.   On December 31, 2000, Braithwaite and Isaacson were both directors of SMX.

156.   Stenton Leigh eventually sold the SMX shell to the Funds for pennies per share.

157.   As of December 31, 2000, Offshore held stock and warrants in SMX which Lauer valued at a total of $188,734,700.  Offshore paid only $2,354,810.25 for these shares.  Thus, Lauer claimed $186,379,889.75 worth of unrealized gain on Offshore's holdings in SMX for 2000.

158.   As of December 31, 2000, Partners held stock and warrants in SMX which Lauer valued at a total of $19,959,750.  Partners paid only $1,416,512.50 for these shares.  Thus, Lauer claimed $18,543,237.50 worth of unrealized gain on Partners' holdings in SMX for 2000.

159.   As of December 31, 2000, Omnifund held stock and warrants in SMX which Lauer valued at a total of $10,699,040.  Omnifund paid only $159,634 for these shares.  Thus, Lauer claimed $10,539,406 worth of unrealized gain on Omnifund's holdings in SMX for 2000.

160.   Finally, as of December 31, 2000, Viator - then still separate from Omnifund - held stock and warrants in SMX which Lauer valued at a total of $8,871,350.  Viator paid only $268,287.50 for these shares.  Thus, Lauer claimed $8,603,062.50 worth of unrealized gain on Viator's holdings in SMX for 2000.

161.   Lauer ascribed this value to SMX despite the fact that SMX had no revenues in 2000, and had total assets of only $2,154,244.

162.   In a Valuation Memo for the Fiscal Year 2000, Lauer justified the outrageously inflated valuation of the Funds' holdings in SMX on the grounds that SMX "is involved in the marketing and sale of NASCAR licensed and owned products to the NASCAR sports enthusiast and collector which today is a multi-billion dollar market."

163.   In reality, SMX's only involvement in the NASCAR products industry was based on loans made to, and an unconsummated merger with, Raceway Net, Inc. and Raceway Marketing LLC.

164.   Lauer's statement in the Valuation Memo was completely false - as of March, 2001, SMX had no prospects whatsoever for penetration into the NASCAR market - or any other market.

165.   As of December 31, 2000, Offshore's holdings in SMX - at the absurdly high NAV stated by Lauer - represented over 27% of the total NAV of Offshore.

166.   This directly contravened the investment restriction in the Offshore PPM which provided that Offshore would not concentrate more than 20% of its NAV in any one security.

167.   99.6% of Offshore's common stock in SMX consisted of restricted shares that had been acquired privately for $2,032,400, at an average cost per share of 36¢.

168.   But, using Lauer's claimed valuation of $27 per share, these shares reflected a gain of $150,274,600 - of which Lauer would receive 20% as an incentive fee under the Offshore Management Agreement.

169.   As of December 31, 2001, Offshore held stock and warrants in SMX which Lauer valued at a total of $133,416,942.75. Offshore paid only $4,243,388.25 total for these shares. Thus, Lauer claimed $129,173,554.50 worth of unrealized gain on Offshore's holdings in SMX for 2001.

170.   As of December 31, 2001, Partners held stock and warrants in SMX which Lauer valued at a total of $24,492,818.50. Partners paid only $2,112,114.86 total for these shares. Thus, Lauer claimed $22,380,703.64 worth of unrealized gain on Partners' holdings in SMX for 2001.

171.   As of December 31, 2001, Omnifund held stock and warrants in SMX which Lauer valued at a total of $10,262,682.50. Omnifund paid only $172,634 total for these shares. Thus, Lauer claimed $10,090,048.50 worth of unrealized gain on Omnifund's holdings in SMX for 2001.

172.   Finally, as of December 31, 2001, Viator - then still separate from Omnifund - held stock and warrants in SMX which Lauer valued at a total of $4,848,550. Viator paid only $373,787.50 total for these shares. Thus, Lauer claimed $4,474,762.50 worth of unrealized gain on Viator's holdings in SMX for 2001.

173.   Yet the following was SMX's true condition as of December 31, 2001:

- SMX had revenues of only $99,441 for the year.

- SMX was still a shell company with *no* operations of any kind.

- SMX had total assets of only $1,282,034.

- SMX was a non-reporting entity that did not file any publicly available financial information.

174. In a Valuation Memo for the 2001 fiscal year, Lauer justified his valuation of the Funds' holdings in SMX on the grounds that the company "has identified numerous potential acquisition candidates, one of which is Space Logic Ltd. (SLL)."

175. The purported acquisition of Space Logic Ltd. had not occurred as of the date of the Valuation Memo, and would never occur.

176. Despite Lauer's absurdly optimistic position on SMX, Offshore managed to obtain 5 million of its SMX shares at absolutely no cost.

177. Offshore paid an average of 19¢ for each share of SMX it purchased.

178. For 2001, Lauer valued these shares at $12.25 per share, for an investment gain of $126,994,600.

### 3. **AUG/Biometrics**

179. An equally egregious reflection of Lauer's abuse of his position as investment manager for the Funds and the role played by the Co-Conspirators in facilitating and profiting from Lauer's misconduct is the Funds' trading of shares of AUG Corp./Biometrics ("AUG").

180. On or about August 31, 2001, Isaacson was the President and CEO of AUG, and Barbarosh was the Vice President and a director of AUG. Isaacson was also the owner of Thornhill.

181. On or about August 31, 2001, the Funds, Alpha Omega (Lauer's personal investment vehicle) and Capital Research entered into an Agreement and Plan of Reorganization (the "AUG Plan") pursuant to which Offshore would become the controlling shareholder of AUG for a purchase price of $400,000.

182. Under the AUG Plan, 131,496,400 shares of common stock of AUG were reduced

to 1,314,964 shares of common stock under a 1:100 reverse stock split

183.  Thereafter, AUG issued 2 million shares of preferred stock to Offshore, convertible to 40 million shares of common stock of AUG, in exchange for $400,000 from Offshore.

184.  On October 20, 2001, Offshore converted the 2 million shares of preferred stock into 40 million shares of common stock of AUG.

185.  On the same day, Capital Research acquired 670,854 shares of restricted common stock out of the 1,314,964 shares of common stock that existed prior to Offshore's conversion of its preferred stock.

186.  Capital Research did not give any consideration for these shares.

187.  AUG's books and records reflect that, of the $400,000 paid by Offshore for the 40 million shares of common stock (after conversion of the preferred stock), $192,500 was allocated to the shares purchased by Offshore ($.005 per share) and $207,500 was allocated to the 670,854 shares of restricted common stock acquired by Capital Research ($.02545 per share).

188.  On October 20, 2001, AUG issued warrants to Alpha Omega.

189.  These warrants were convertible into 50 million shares of common stock of AUG as follows: 10 million shares for $.01 per share before November 30, 2001, 20 million shares for $.05 per share before August 31, 2004, and an additional 20 million shares for $.10 per share before August 31, 2006.

190.  Alpha Omega did not pay AUG for the warrants.

191.  At some point prior to November 30, 2001, Partners exercised the warrants provided to Alpha Omega by purchasing 10 million shares for $100,000.

192.  At some point, Alpha Omega apparently transferred the warrant rights to Partners.

193.    Of the $100,000 paid by Partners to AUG, $13,000 was paid to Thornhill, based on a purported "investment banking" agreement between Thornhill and AUG.

194.    At some point prior to December 31, 2001, AUG issued an additional 27.5 million shares of restricted common stock to Offshore in exchange for $700,000, or about $.025 per share.

195.    Of the $700,000, Thornhill received $91,000, again based on the purported investment banking agreement.

196.    On December 13, 2001, Viator purchased 1.4 million shares of common stock of AUG for $35,000, and Orbiter purchased 2 million shares of common stock of AUG for $50,000.

197.    Viator and Orbiter paid the $85,000 for this transaction to Alpha Omega (Lauer's personal investment vehicle), even though Alpha Omega did not pay for these shares.

198.    On December 14, 2001, Partners purchased an additional 12.5 million shares of restricted common stock from AUG in a private transaction for $500,000, or $.04 per share.

199.    On December 28, 2001, Offshore purchased 18 million shares of restricted common stock from AUG in a private transaction at a cost of $500,000, or $.0278 per share.

200.    Before the end of 2001, AUG issued 1.375 million shares of common stock to Capital Research and 2 million shares of common stock to Sterling, a company owned by Cowen; to Isaacson and his wife Lori; and to Andora Investments, L.P., an entity in which Barbarosh was a partner.

201.    AUG did not receive any money as a result of these transactions.

202.    On December 31, 2001, even though it had purchased tens of millions of shares of common stock in AUG at prices ranging from $.005 per share to $.0278 per share, Offshore purchased 1,500 shares of common stock of AUG for $3.40 per share, or about 130 times greater

than the highest price it had paid for the common stock of AUG during the prior 3 months.

203. The total number of shares of AUG common stock traded on December 31, 2001, was 1,800, or 300 more than purchased by Offshore.

204. Based on the December 31, 2001 trade by Offshore, Lauer valued all of the shares of AUG owned by all of the Funds at $3.40 per share, for a total of over $115,000,000.

205. The purported management and incentive fees payable to the Management Companies as a result of the activity in the fourth quarter of 2001 was in excess of $25,000,000.

206. While Lauer valued the Funds' shares of AUG as of December 31, 2001, at $115,000,000, the following describes the true financial condition of AUG at the time:

- AUG had no revenues in 2001;

- AUG had a negative cash flow from operations of $385,593;

- AUG had an accumulated deficit from operations of $22,371,214;

- In their audit for the 2001 fiscal year, AUG's auditors expressed significant doubt about AUG's ability to continue as a going concern.

207. Despite Lauer's December 31, 2001 valuation of AUG at $3.40 per share, Offshore purchased 6 million shares of restricted common stock of AUG in a private transaction for $300,000 or $.05 per share on March 20, 2002.

208. During the first quarter of 2002, Offshore bought 8,995 shares of unrestricted common stock of AUG, and sold 4,300 shares of common stock of AUG, at an average price of $4.28 per share.

209. The 4,300 shares sold by Offshore were purchased by Partners.

210. Without double-counting the 4,300 shares sold from Offshore to Partners, the trades by Offshore and Partners represented 81% of the total number of shares of unrestricted common stock traded in AUG during the first quarter of 2002.

211.    At the end of the first quarter of 2002, the Funds collectively held 39,908,955 shares of AUG common stock of which 39.9 million shares (99.99% of the total) were restricted and 8,955 shares (.0022% of the total) were unrestricted.

212.    On or about March 28, 2002, Huard, an employee of Shamrock, the financial advisory services firm owned by Kelly, purchased 500 shares of common stock of AUG at a price of $5.25 per share.

213.    On March 31, 2002, Lauer valued all of the Funds' shares of common stock in AUG, including the 39,908,955 shares of restricted common stock, at $5.25 per share, based on the March 28, 2002 Huard trade, even though just nine days earlier Offshore purchased 6 million shares of restricted common stock of AUG for only $.05 per share.

214.    On April 12, 2002, just twelve days after Lauer valued the Funds' shares of common stock in AUG at $5.25 per share, Offshore acquired 4,400,000 restricted shares of common stock in a private transaction for $1,100,000 ($.25 per share).

215.    On June 15, 2002, Offshore purchased an additional 500,000 restricted shares of common stock of AUG for $750,000 ($1.50 per share).

216.    At the end of the second quarter, the Funds collectively owned a total of 44,839,317 shares of common stock of AUG, of which 44.8 million shares (99.9% of the total) were restricted and 39,317 shares (less than 1/10 of 1% of the total) were unrestricted.

217.    Lauer valued all of the Funds' holdings in AUG common stock at $4.95 per share.

218.    On July 15, 2002, Offshore purchased 200,000 shares of restricted common stock from AUG in a private transaction at a cost of $300,000, or $1.50 per share.

219.    Thornhill received $39,000 from the proceeds of this transaction.

220.    As of December 31, 2002, Lauer valued the Funds' holdings in AUG at

$247,000,000.

221.    Of course, this valuation had nothing at all to do with reality - 2002 was no better to AUG than 2001, as reflected by the following:

- As of September 30, 2002, AUG, which merged with Biometrics Security Technology, Inc. ("Biometrics") during 2002, reported total revenues for the nine months of just $68,936;

- AUG showed a net loss for the year of $24,831,555;

- AUG never has filed any statements with the SEC on its complete results from operations from 2002;

- In their audit for the 2002 fiscal year, AUG's auditors expressed significant doubt about AUG's ability to continue as a going concern.

222.    Stenton Leigh provided a valuation of AUG/Biometrics which supported Lauer's absurd overvaluation of AUG/Biometrics.

223.    Furthermore, Stenton Leigh and AUG/Biometrics shared a common address.

224.    AUG and its subsidiaries paid a total of over $1,000,000 in "investment banking fees" to Thornhill as a result of the private placement transactions between AUG and the Funds.

225.    Most, if not all, of the money AUG used to pay Thornhill came from the Funds.

226.    Thornhill provided no apparent service that would entitle it to an investment banking fee from AUG.

**4.    Fidelity First**

227.    The Defendants' conduct with respect to Fidelity First Financial Corp. ("Fidelity First") also evidence the general ongoing breach of the Defendants' duties to the Funds.

228.    Fidelity First was yet another shell corporation used by Lauer to inflate the Funds' NAVs and, accordingly, his own fee income.

229.    As of December 31, 2000, Maum was the president and chief executive officer of Fidelity First.

230.    Raker was the executive vice president and chief financial officer of Fidelity First.

231.    As of December 31, 2000, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $39,510,715.50. Offshore paid only $8,200,355.90 for these shares. Thus, Lauer claimed $31,310,359.60 worth of unrealized gain on Offshore's holdings in Fidelity First for 2000.

232.    As of December 31, 2000, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $21,972,685.50. Partners paid only $3,316,890.97 for these shares. Thus, Lauer claimed $18,655,794.53 worth of unrealized gain on Partners' holdings in Fidelity First for 2000.

233.    As of December 31, 2000, Omnifund held stock and warrants in Fidelity First which Lauer valued at a total of $8,057,236.32. Omnifund paid only $976,370.61 for these shares. Thus, Lauer claimed $7,080,865.71 worth of unrealized gain on Omnifund's holdings in Fidelity First for 2000.

234.    Finally, as of December 31, 2000, Viator - then still separate from Omnifund - held stock and warrants in Fidelity First which Lauer valued at a total of $1,462,054. Viator paid only $128,902 for these shares. Thus, Lauer claimed $1,333,152 worth of unrealized gain on Viator's holdings in Fidelity First for 2000.

235.    Lauer's valuation of Fidelity First obviously had nothing to do with Fidelity First's economic fundamentals as of December 31, 2000, which reflected that:

- Fidelity First had discontinued operations, and revenues of only $810,696 for the year, all generated prior to disposing of its mortgage banking operation.

- Fidelity First had *no* remaining operations of any kind.

- Fidelity First had a *negative* net worth of $753,520.

- Fidelity First was a non-reporting entity that did not file any publicly available financial information.

236.    During 2001, Fidelity First was in default of a $500,000 loan from the Funds. The loans were convertible into common stock.

237.    Rather than pursue Fidelity First for the monies loaned, Lauer caused the Funds to convert approximately $500,000 in past due loans to Fidelity First into common stock in Fidelity First. This conversion was done at a ratio of one share of stock for each penny of debt and accrued interest. The Funds thus received 56,656,629 additional shares in Fidelity First in exchange for the forgiveness of $500,000 in debt Fidelity First could not repay.

238.    Cowen negotiated this conversion rate with Fidelity First.

239.    Lauer then valued the shares obtained through the conversion at $2 per share.

240.    Thus, the conversion allowed Lauer and the Co-Conspirators to magically transform approximately $500,000 in worthless debt which should have been valued at close to nothing into an equity position with a purported value of approximately $113,000,000.

241.    Also during 2001, the Funds made loans to Fidelity First for which it essentially paid "consulting fees" to Capital Research.  For instance, on September 17, 2001, Capital Research received a $5,000 consulting fee in a note on $50,000 convertible promissory note for Fidelity First transaction with the Funds.   On October 29, 2001, Capital Research received a $5,000 "cash fee for consulting" on a $40,000 loan by one of the Funds to Fidelity First.  On December 6, 2001, Capital Research received a $5,000 cash fee for consulting on a $35,000 loan by one of the Funds to Fidelity.

242.    As of December 31, 2001, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $120,192,474.  Offshore paid only $9,573,825.90 total for these shares.  Thus, Lauer claimed $110,618,648.10 worth of unrealized gain on Offshore's holdings in Fidelity First for 2001.

243.   As of December 31, 2001, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $35,233,810.50.  Partners paid only $3,555,880.97 total for these shares.  Thus, Lauer claimed $31,677,929.53 worth of unrealized gain on Partners' holdings in Fidelity First for 2001.

244.   As of December 31, 2001, Omnifund held stock and warrants in Fidelity First which Lauer valued at a total of $6,569,904.  Omnifund paid only $976,370.61 total for these shares.  Thus, Lauer claimed $5,593,533.39 worth of unrealized gain on Omnifund's holdings in Fidelity First for 2001.

245.   Finally, as of December 31, 2001, Viator - then still separate from Omnifund - held stock and warrants in Fidelity First which Lauer valued at a total of $1,889,971.  Viator paid only $128,902 total for these shares.  Thus, Lauer claimed $1,761,069 worth of unrealized gain on Viator's holdings in Fidelity First for 2001.

246.   Notwithstanding this incredibly high valuation of Fidelity First by Lauer, the following was true of Fidelity First as of December 31, 2001:

- Fidelity First had revenues of only $106,768 in 2001, none of which came from operations;

- Fidelity First had *no* operations of any kind;

- Fidelity First had total assets of only $81,646 and a *negative* net worth of $424,669;

- Fidelity First was a non-reporting entity that did not file any publicly available financial information.

247.   In a Valuation Memo for the year 2001, Lauer justified his valuation of the Funds' holdings in Fidelity First on the grounds that the company "has developed an acquisition strategy to build a new type of financial services company.  The concept is based upon the acquisition of Columbia National and or Vcross . . .."

248.   Unsurprisingly, the purported acquisitions never occurred.

249.   Lauer continued to pump Fidelity First's value throughout 2002.

250.   As of December 31, 2002, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $181,489,346.   Offshore paid only $10,531,830.73 total for these shares.   Thus, Lauer claimed $170,957,515.27 worth of unrealized gain on Offshore's holdings in Fidelity First for 2002.

251.   As of December 31, 2002, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $51,462,405.01.   Partners paid only $3,487,247.22 for these shares. Thus, Lauer claimed $47,975,157.79 worth of unrealized gain on Partners' holdings in Fidelity First for 2002.

252.   As of December 31, 2002, Omnifund - now combined with Viator - held stock and warrants in Fidelity First which Lauer valued at a total of $11,398,325.   Omnifund paid only $1,099,803.68 for these shares.   Thus, Lauer claimed $10,298,521.32 worth of unrealized gain on Omnifund's holdings in Fidelity First for 2002.

253.   Lauer's stated valuation contrasted sharply with the inescapable fact that Fidelity First continually failed throughout 2002 to show any signs of building "a new type of financial services company":

- Fidelity First had no revenue during 2002;

- Fidelity First had no operations of any kind;

- Fidelity First had total assets of only $25,101;

- Fidelity First was a non-reporting entity that did not file any publicly available financial information.

254.    Stenton Leigh provided the Funds a valuation supporting Lauer's absurd over-evaluation of Fidelity First.

### 5.    **Miscellaneous Examples of Self-Dealing**

255.    Other blatant examples of Lauer's breach of his duties, with the assistance of the Co-Conspirators, include the following:

### a.    **EPL**

256.    EPL Technologies ("EPL") was another entity in which the Funds invested.

257.    On December 1, 1999, Viator agreed to loan $500,000 to EPL.  Capital Research received $40,000 as a "closing fee" for the transaction.   Also on December 1, 1999, Offshore agreed to loan EPL $3,000,000.   Capital Research received $240,000 plus a warrant for 350,000 common shares of EPL as a "closing fee" for the second transaction.   The trend of Capital Research getting "consulting fees" for the same "services" Lauer was supposed to provide to the Funds continued over the next several years, with Capital Research obtaining hundreds of thousands of shares and considerable cash for no consideration, relating to modifications of the loans.

### b.    **Equitel**

258.    Equitel, Inc. f/k/a Wolfpack f/k/a TeleData World Services ("Equitel") was another entity in which the Funds invested.

259.    On February 8, 2000, the Funds agreed to loan $1,000,000 to Equitel in return for a 34% equity interest in Equitel.   As part of this transaction, Capital Research received a cash fee of $70,000 plus a 2.5% interest in Equitel common stock.

### c.    **China Broadband**

260.   China Broadband Corp. ("China Broadband") was another entity in which the Funds invested.

261.   On May 12, 2000, the Funds purchased 1,301,667 shares from China Broadband at $7.50 per share.  On that same day, China Broadband sold 1,530,000 shares to Lauer, Garvey and Hauser at $1.00 per share - $6.50 less than the Funds paid.

      **d.**     **The Girlfriends**

262.   Upon information and belief, Lauer would often use the Girlfriends to assist him in violating his duties to the Funds by placing valuable assets, including aircraft and cash, in their names in an effort to prevent investors and/or the SEC from seizing such assets.

**IV.**
**THE RECEIVERSHIP AND BANKRUPTCY ACTIONS**

263.   Lauer managed to shield his misdeeds and those of his Co-Conspirators from the investors in the Funds.  Lauer did not report his activities to investors.

264.   In late 2002, however, the New York Post published articles describing some of Lauer's misdeeds.

265.   At or around this time, as a result of the activities described above, the SEC began an investigation of Lauer and the Funds, as did the Financial Services Commission (the "FSC"), the governmental agency regulating securities in the BVI.

266.   As a result, many investors requested redemptions of their shares, which the Funds could not pay, notwithstanding the valuations of the Funds' holdings ascribed by Lauer.

267.   Many investors also filed lawsuits against the Funds.

268.   In light of the investor redemption requests and litigation, and the SEC and FSC investigations, on April 16, 2003, Partners commenced a Chapter 11 bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the

- 35 -

Bankruptcy Code in the Connecticut Bankruptcy Court.

269. On May 2, 2003, the FSC in the BVI filed an application for the appointment of an administrator over Offshore and Omnifund.

270. On July 8, 2003, the SEC filed in this Court a Complaint for Injunctive and Other Relief against Lauer, the Original Receivership Entities, and Partners, Case No. 03-80612-CIV-ZLOCH (the "Enforcement Proceeding").

271. On July 10, 2003, this Court entered the Receivership Order.

272. Paragraph 1 of the Receivership Order directs the Receiver to "[t]ake immediate possession of all property, assets and estates of every kind of [the Receivership Entities] ... including, but not limited to ... stocks, bonds, debentures and other securities ... and to administer such assets pending further order of this Court ... "

273. Paragraph 2 of the Receivership Order directs the Receiver to:

> Investigate the manner in which the affairs of Lancer, Lancer II, Offshore, Omnifund, Offshore LSPV, and Partners LSPV were conducted and institute such actions and legal proceedings, for their benefit and on their behalf, and on behalf of the Funds' investors and other creditors, as the Receiver deems necessary ... against any transfers of monies or other proceeds directly or indirectly traceable from investors in the Funds; provided such actions may include ... recovery and avoidance of fraudulent transfers under Florida Statute § 726.101, et seq. or other state law...

274. On July 10, 2003, the Court, with Lauer's consent, also entered a Preliminary Injunction Order extending the Temporary Restraining Order until resolution of this Proceeding on the merits (the "Preliminary Injunction").

275. On July 24, 2003, the Connecticut Bankruptcy Court entered the July 24, 2003 Order.

276.    Paragraph D of the July 24, 2003 Order provides that "[the] Receiver, by virtue of orders entered in the SEC Action, has now become the representative for the administration and management of all entities, including [Partners'] general partner … and therefore, in that capacity, has also become responsible for managing and administering [Partners]."

277.    Paragraph E of the July 24, 2003 Order further provides that "pursuant to Bankruptcy Rule 9001(5)(B), the Receiver is the person in control of [Partners]."

278.    On September 3, 2003, the Court entered an Order expanding the terms of the Receivership Order to include Alpha Omega and GH.

279.    On January 9, 2004, the Receiver, on behalf of Partners, filed an Agreed Motion to Transfer Venue of the Bankruptcy Case to this Court (the "Motion to Transfer Venue").

280.    On February 10, 2004, the Connecticut Bankruptcy Court entered an Order granting the Motion to Transfer Venue (the "Transfer Order").

281.    Paragraph 2 of the Transfer Order provides that the Bankruptcy Case "is hereby transferred to the United States District Court for the Southern District of Florida to be administered by the District Court as a bankruptcy case under Title 11 and pursuant to 28 U.S.C. § 1334(a) through (c)."

## V.
## THE DAMAGES CAUSED BY THE DEFENDANT'S ACTIONS

282.    As the direct and proximate result of the actions described, the Funds have been damaged in a number of different ways.

283.   <u>First</u>, the Funds were depleted by paying extraordinary amounts in management, incentive and consulting fees to Lauer, Garvey, Hauser, the Co-Conspirators, to service providers and, in some cases, to referring brokers.

284.   <u>Second</u>, the Funds were depleted by having their value poured into continuing "investments" in various portfolio companies.

285.   <u>Third</u>, the Funds were depleted by redemptions calculated and paid out to investors based on the inflated and erroneous NAV's.

286.   The values ascribed to the redeemed shares were based on the inflated and erroneous NAV's.

287.   But for the acts of the Defendants, these NAV's would have been substantially lower and, correspondingly, the depletions of the Funds' value through redemptions would have been much less.

288.   <u>Fourth</u>, the Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing their insolvency and the amount of the debt that the Funds are now unable to repay.

**<u>COUNT I</u>**
**<u>NEGLIGENCE, WASTE AND MISMANAGEMENT</u>**
**(Lauer, Garvey, and Hauser)**

289.   The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

290.   At all relevant times, Lauer, Garvey and Hauser owed the Funds a fiduciary duty and a duty of good faith to use reasonable care in handling the business affairs and assets of the Funds, including but not limited to, the investments of hundreds of millions of dollars made on behalf of the investors.

291.    These duties included an obligation to implement certain investment safeguards, as promised the investors, to ensure that the investments were protected and not otherwise wasted.

292.    Lauer, Garvey and Hauser, however, breached their duties and squandered millions of dollars of investor funds.

293.    A significant portion of the funds Lauer, Garvey and Hauser did not squander or take as excessive management fees and commissions were invested in direct contravention of promises made to investors.

294.    As a result of their mismanagement of the Funds' assets, namely, investor funds, Lauer, Garvey and Hauser caused the Funds to transfer vast sums of the investor money to persons and entities who were not entitled to same and further caused the Funds to invest in worthless investments, thereby losing a significant portion of the value of the Funds' assets.

295.    The Funds are liable to investors for millions of dollars resulting from the Lauer's, Garvey's and Hauser's waste of the corporations' assets.

296.    As a further result of Lauer's, Garvey's and Hauser's transactions, whatever legitimate business the Funds conducted was completely destroyed resulting in further damages.

**WHEREFORE,** the Receiver prays for judgment against Lauer, Garvey, and Hauser in the amount of the claims asserted by investors against the Funds as a result of their negligence, waste, and mismanagement in handling the Funds' assets, plus appropriate interest, attorneys' fees, and costs.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (Lauer, Garvey, and Hauser)

297.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

298.    Lauer, Garvey, and Hauser, as corporate officers or controlling persons of the Funds, each owed a fiduciary duty to the Funds to act in the best interests of the Funds and not for their own personal benefit when dealing with the Funds and the monies invested in the Funds.

299.    Garvey and Hauser knowingly, recklessly, or with gross negligence breached their fiduciary duties to the Funds by failing to detect and prevent Lauer from injuring the Funds and by actively injuring the Funds themselves.

300.    Rather than acting in the Funds' best interests, Lauer, Garvey, and Hauser acted solely to enrich themselves by engaging in practices including, but not limited to: (a) engaging in manipulative trading practices to create artificially high NAVs for the Funds; (b) causing the Funds to purchase shell corporations with little or no ongoing business; (c) allowing Lauer to value nearly worthless holdings in shell corporations and other holdings at exorbitant amounts in violation of the PPMs and other agreements and applicable law; (d) siphoning money from the Funds through consultants' fees paid to third parties for their own financial benefit; and (e) employing incompetent and/or corrupt consultants, valuation shills, and stock brokers to assist them in carrying out these activities.

301.    Lauer, Garvey, and Hauser caused damages to the Funds additionally in the form of excessive investor redemptions and extensive investor and other claims accrued against the Funds during the Funds' artificially prolonged existence.

**WHEREFORE,** the Receiver prays for judgment against Lauer, Garvey, and Hauser in the amount of the claims asserted by investors against the Funds as a result of the Funds' artificially prolonged insolvent existence, plus appropriate interest, attorneys' fees, and costs.

**COUNT III**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(All Co-Conspirators)**

302.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

303.    The Co-Conspirators negligently, recklessly, or knowingly aided and abetted the above-described breaches of fiduciary duty committed by Lauer, Garvey, and Hauser.

304.    Capital Research and Sterling negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by finding corporations for use in artificially inflating the Funds' NAV.

305.    Kelly and Huard negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by brokering and clearing Lauer's manipulative stock purchases and other market transactions.

306.    Braithwaite and Maum negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by assisting Lauer's valuation scheme from the inside of certain portfolio companies for which she served as a board member at Lauer's pleasure.

307.    Newman negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser through by using his knowledge of the Funds' trading systems to assist in Lauer's systematic overvaluation of the Funds' NAVs.

308.   Newman also negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by assisting in and placing manipulative trades and by ordering wire transfers to portfolio companies in advancement of Lauer's and the Co-Conspirator's plans to ensure that those service providers continued providing the Funds their services.

309.   Barbarosh, Levie, Isaacson, Maum, LII, Stenton Leigh, and Thornhill negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by finding and bringing shell corporations and other vehicles for NAV inflation to Lauer.

310.   Barbarosh, Levie and Stenton Leigh further negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by providing grossly improper valuations of shell corporations in order to justify the inflated valuations placed on those corporations by Lauer, Garvey, and Hauser.

311.   Isaacson further negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey, and Hauser by serving as a director and/or officer for several portfolio companies.

312.   Carens and Brisman negligently, recklessly, or knowingly aided and abetted the fiduciary breaches of Lauer, Garvey and Hauser by assisting Lauer, Garvey and Hauser in hiding and secreting away the fruits of such fiduciary breaches and the assets of the Funds.

313.   The Co-Conspirators each benefited monetarily from the aid they provided to the fiduciary breaches of Lauer, Garvey and Hauser in the form of payments for "consulting," payments for alleged "services," payments for "referral" or "finders" fees, receipt of unpaid-for stock in portfolio companies, payment of unearned salary or other compensation, continued

business relationships with the Funds, payments as directors or officers of portfolio companies, and receipt of other compensation.

314.    The Co-Conspirators each provided little or no value to the Funds in exchange for the payments they received.

315.    Because the Co-Conspirators aided and abetted the breaches of fiduciary duty by Lauer, Garvey and Hauser, the Co-Conspirators may also be held liable for the breaches of fiduciary duty.

**WHEREFORE,** the Receiver prays for judgment against the Co-Conspirators in the amount of the claims asserted by investors against the Funds as a result of the Funds' artificially prolonged insolvent existence, plus appropriate interest, attorneys' fees, and costs.

**COUNT IV**
**UNJUST ENRICHMENT**
**(All Defendants)**

316.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

317.    From at least December, 1997 through July 10, 2003, the Defendants regularly received, directly or indirectly, compensation, distributions, stock, or other payments from the Funds for little or no consideration and despite their breaches of various duties or aiding of breaches of various duties to the Funds.

318.    All of these transfers were made to the Defendants directly or to third parties controlled by them for their personal benefit and for little or no apparent consideration.

319.    The bona fide services, if any, performed by the Defendants on behalf of the Funds did not warrant or justify the aforementioned payments.

320.    It would be unjust and inequitable to allow the Defendants to retain the property they received from the Funds under the circumstances alleged herein.

**WHEREFORE,** the Receiver prays for judgment against the Defendants in the amount the Defendants were unjustly enriched at the expense of the Funds, plus appropriate interest, attorneys' fees, and costs.

## COUNT V
## BREACH OF ERISA FIDUCIARY DUTY
### (Lauer, Garvey, Hauser)

321.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

322.    Various benefit plan investors, including certain pension benefit plans subject to ERISA, have a significant equity interest in Offshore.

323.    Consequently, the assets of such ERISA pension benefit plans include an undivided interest in each of Offshore's underlying assets.

324.    Offshore's assets, therefore, constitute "plan assets" under ERISA.

325.    As the court-appointed receiver for Offshore, the Receiver has authority or control respecting the management or disposition of Offshore's underlying assets and, to that extent, is an ERISA fiduciary with respect to the assets in Offshore.

326.    As a fiduciary of plan assets in Offshore, the Receiver is authorized to bring a civil action for appropriate relief.

327.    As a fiduciary of plan assets in Offshore, the Receiver is authorized to bring a civil action to enjoin any act or practice which violates any provision of Title IV of ERISA, or to obtain other appropriate equitable relief to redress such violations or to enforce any provision of ERISA.

328.    Lauer, Garvey, and Hauser exercised authority or control respecting the management or disposition of Offshore's underlying assets and therefore was a fiduciary with respect to the ERISA pension plans invested in Offshore.

329.    Lauer, Garvey, and Hauser rendered investment advice for a fee or other compensation with respect to plan assets invested in Offshore.

330.    Consequently, Lauer, Garvey, and Hauser were fiduciaries with respect to the ERISA plans invested in Offshore.

331.    As an ERISA fiduciary, Lauer, Garvey, and Hauser were obligated to discharge their duties with respect to ERISA plans invested in Offshore: (i) solely in the interest of the beneficiaries of the ERISA plans; (ii) for the exclusive purpose of providing benefits to the beneficiaries of the ERISA plans and defraying reasonable plan administration expenses; (iii) with the care, skill, prudence and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and (iv) by diversifying the investments of the ERISA plans invested in Offshore so as to minimize the risk of large losses, unless under the circumstances it was clearly prudent not to do so.

332.    Lauer, Garvey, and Hauser knowingly, recklessly, or with gross negligence breached their respective fiduciary duties to the ERISA pension plans invested in Offshore by acting solely in their own interests, rather than in the best interests of the ERISA pension plans or the Funds.

333.    The Receiver is entitled to relief from Lauer, Garvey, and Hauser in the form of: (i) a monetary payment to Offshore to reimburse Offshore for the losses incurred or profits received with respect to the plan assets resulting from the breaches of fiduciary duties alleged

above; (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above; and (iii) reasonable attorneys' fees and expenses.

**WHEREFORE,** the Receiver prays for judgment against Lauer, Garvey, and Hauser in the amount of the claims asserted against Offshore with respect to plan assets due to Offshore's artificially prolonged insolvent existence, for injunctive and other appropriate equitable relief, plus appropriate interest, attorneys' fees, and costs.

<u>**COUNT VI**</u>
<u>**LIABILITY UNDER ERISA FOR BREACH BY CO-FIDUCIARIES**</u>
**(All Defendants)**

334.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

335.    As ERISA fiduciaries, the Defendants are subject to co-fiduciary liability under if: (i) they participated knowingly in, or knowingly undertook to conceal, an act or omission of another fiduciary; (ii) they enabled, through failure to comply with their own fiduciary obligations, another fiduciary to commit a breach; or (iii) they had knowledge of another's breach, unless they made reasonable efforts under the circumstances to remedy the breach.

336.    The Defendants knowingly, recklessly, or with gross negligence breached their fiduciary duties to the ERISA pension plans invested in Offshore by aiding Lauer's, Garvey's, and Hauser's breaches of their fiduciary duties and by assisting Lauer, Garvey, and Hauser in manipulating Offshore's stated NAV.

337.    Because Lauer, Garvey, and Hauser exercised authority and control over the management and disposition of the underlying assets of Offshore, they were fiduciaries under the ERISA pension plans invested in Offshore.

338.    The Defendants are liable for the breach of duty by their co-fiduciaries, Lauer, Garvey, and Hauser because the Defendants enabled Lauer, Garvey, and Hauser to commit breaches.

339.    Alternatively, the Defendants had or should have had knowledge of the breaches of fiduciary duty by Lauer, Garvey, and Hauser and failed to make reasonable efforts under the circumstances to remedy such breaches.

340.    The Receiver is entitled to relief from the Defendants in the form of: (i) a monetary payment to Offshore to reimburse it for the losses incurred or profits received with respect to the plan assets resulting from the breaches of fiduciary duties alleged above, including profits received by Lauer, Garvey, and Hauser; (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above; and (iii) reasonable attorneys' fees and expenses.

**WHEREFORE,** the Receiver prays for judgment against the Defendants in the amount of the claims asserted against Offshore with respect to plan assets due to Offshore's artificially prolonged insolvent existence, for injunctive and other appropriate equitable relief, reasonable attorneys' fees and expenses, and any other relief the Court deems just and proper.

## COUNT VII
## PROFESSIONAL MALPRACTICE
### (Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill)

341.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

342.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all purported to provide professional services to the Funds.

343.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all owed a duty of professional care to the Funds.

344.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all negligently, recklessly or knowingly breached their duty of professional care by aiding and abetting Lauer, Garvey, and Hauser's breaches of their fiduciary duties, by providing unreasonable investment advice, by providing incompetent consulting, investment, and valuation services, and by exploiting the Funds for their own personal gain.

345.    The breaches of professional care by Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill proximately caused the Funds' hopeless insolvency and eventual collapse.

**WHEREFORE,** the Receiver prays for judgment against Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill in the amount of the claims asserted by investors against the Funds as a result of the Funds' artificially prolonged insolvent existence, plus appropriate interest, attorneys' fees, and costs.

<u>COUNT VIII</u>
<u>BREACH OF CONTRACT</u>
**(Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill)**

346.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 288 above as if fully stated herein.

347.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all agreed to provide services for the Funds pursuant to express oral and/or written contracts with the Funds.

348.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all failed to perform as obligated under their contracts with the Funds by aiding and abetting Lauer, Garvey, and Hauser's breaches of their fiduciary duties, by

providing unreasonable investment advice, by providing incompetent consulting, investment, and valuation services, and by exploiting the Funds for their own personal gain.

349.   The breaches of contract by Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all resulted in the Funds' hopeless insolvency and eventual collapse.

**WHEREFORE,** the Receiver prays for judgment against Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill in the amount of the claims asserted by investors against the Funds as a result of the Funds' artificially prolonged insolvent existence, plus appropriate interest, attorneys' fees, and costs.

Dated: April 15, 2005

**HUNTON & WILLIAMS LLP**
*Counsel for the Receiver*
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
305-810-2500
305-810-2460 (fax)

By_____
    Andrew D. Zaron (FBN 965790)
    Kevin M. Eckhardt (FBN 412902)

- 49 -

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of the Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE SIDE OF THE FORM.)

**I.(a) PLAINTIFFS**
COURT-APPOINTED RECEIVER OF
LANCER MANAGEMENT GROUP LLC,
LANCER MANAGEMENT GROUP II LLC,
LANCER OFFSHORE INC.,
OMNIFUND LTD., LSPV INC.,
LSPV LLC, ALPHA OMEGA GROUP INC.,
and G.H. ASSOCIATES LLC, and
RESPONSIBLE PERSON OF LANCER PARTNERS, L.P.

**DEFENDANTS**
MICHAEL LAUER; MARTIN GARVEY; ERIC HAUSER; DAVID NEWMAN;
MILTON BARBAROSH; GEORGE LEVIE; STENTON LEIGH CAPITAL
CORPORATION; KATHRYN COWEN a/k/a KATHRYN BRAITHWAITE;
STERLING TECHNOLOGY PARTNERS; JAMES KELLY; JOSEPH HUARD;
SHAMROCK PARTNERS LTD.; CAPITAL RESEARCH LTD.; LAURENCE
ISAACSON; L. ISAACSON, INC.; THORNHILL GROUP, INC.; ROBERT
MAUM; JAMES RAKER; HEIDI CARENS; JUDITH BRISMAN

**(b) County of Residence of First Listed Plaintiff** Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Andrew D. Zaron
HUNTON & WILLIAMS LLP
Counsel for Plaintiff
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Ph: (305) 810-2500
Fax: (305) 810-2460

Attorneys (If Known)
Andrew Zaron

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PL | DEF |  | PL | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen of Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐610 Agriculture | ☐422 Appeal 28 USC 158 | ☐400 State Reapportionment |
| ☐120 Marine | ☐310 Airplane / ☐362 Personal Injury— | ☐620 Other Food & Drug | | ☐410 Antitrust |
| ☐130 Miller Act | ☐315 Airplane Product / Med. Malpractice | ☐625 Drug Related Seizure | ☐423 Withdrawal | ☐430 Banks and Banking |
| ☐140 Negotiable Instrument | Liability / ☐365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐450 Commerce/ICC Rates/etc. |
| ☐150 Recovery of Overpayment | ☐320 Assault, Libel & / Product Liability | ☐630 Liquor Laws | | ☐460 Deportation |
| & Enforcement of Judgment | Slander / ☐368 Asbestos Personal | ☐640 R.R. & Truck | **PROPERTY RIGHTS** | ☐470 Racketeer Influenced and |
| ☐151 Medicare Act | ☐330 Federal Employers' / Injury Product | ☐650 Airline Regs. | ☐820 Copyrights | Corrupt Organizations |
| ☐152 Recovery of Defaulted | Liability / Liability | ☐660 Occupational | ☐830 Patent | ☐810 Selective Service |
| Student Loans | ☐340 Marine / **PERSONAL PROPERTY** | Safety/Health | ☐840 Trademark | ☐850 Securities/Commodities/ |
| (Excl. Veterans) | ☐345 Marine Product / ☐370 Other Fraud | ☐690 Other | | Exchange |
| ☐153 Recovery of Overpayment | Liability / ☐371 Truth in Lending | | | ☐875 Customer Challenge |
| of Veteran's Benefits | ☐350 Motor Vehicle / ☐380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☒160 Stockholders' Suits | ☐355 Motor Vehicle / Property Damage | ☐710 Fair Labor Standards | ☐861 HIA (1395 ff) | ☐891 Agriculture Acts |
| ☐190 Other Contract | Product Liability / ☐385 Property Damage | Act | ☐862 Black Lung (923) | ☐892 Economic Stabilization Act |
| ☐195 Contract Product Liability | ☐360 Other Personal Injury / Product Liability | ☐720 Labor/Mgmt. Relations | ☐863 DIWC/DIWW (405(g)) | ☐893 Environmental Matters |
| | | | ☐864 SSID Title XVI | ☐894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐730 Labor/Mgmt. Reporting | ☐865 RSI (405(g)) | ☐895 Freedom of |
| ☐210 Land Condemnation | ☐441 Voting / ☐510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐220 Foreclosure | ☐442 Employment / Sentence | ☐740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐900 Appeal of Fee Determina- |
| ☐230 Rent Lease & Ejectment | ☐443 Housing/ / Habeas Corpus: | | ☐870 Taxes (U.S. Plaintiff or | tion Under Equal Access to |
| ☐240 Torts to Land | Accommodations / ☐530 General | ☐790 Other Labor Litigation | Defendant) | Justice |
| ☐245 Tort Product Liability | ☐444 Welfare / ☐535 Death Penalty | | ☐871 IRS-Third Party | ☐950 Constitutionality of |
| ☐290 All Other Real Property | ☐440 Other Civil Rights / ☐540 Mandamus & Other | ☐791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | / ☐550 Other Rights | Security Act | | ☒890 Other Statutory Actions |
| | / ☐555 Prison Condition | | | |

(PLACE AN "X" IN ONE BOX ONLY)

## V. ORIGIN

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

Transfer from
another district
☐ 5 (specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
This is an action for damages brought by a Securities and Exchange Commission receiver appointed pursuant to 28 USC § 754 and 1692.

**VII. REQUESTED IN** ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND: UNKNOWN    CHECK YES only if demanded in complaint:
**COMPLAINT:** (as set forth in Plaintiff's Response to Requests for Admissions)    JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions:)    04-CV-80211/MARRA/VITUNAC
JUDGE Kenneth A. Marra    DOCKET NUMBER    03-CV-80612-MARRA/VITUNAC

DATE    April 15, 2005    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____

$250.00    919227
04/15/05

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a)  Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residences of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.