UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-60584-CIV-MARRA/VITUNAC

COURT-APPOINTED RECEIVER OF LANCER
MANAGEMENT GROUP LLC, LANCER
MANAGEMENT GROUP II LLC, LANCER
OFFSHORE INC., OMNIFUND LTD., LSPV INC.,
LSPV LLC, ALPHA OMEGA GROUP INC., and
G.H. ASSOCIATES LLC, and
RESPONSIBLE PERSON OF LANCER
PARTNERS, L.P.,

          Plaintiff,

vs.

MICHAEL LAUER; MARTIN GARVEY; ERIC
HAUSER; DAVID NEWMAN; MILTON
BARBAROSH; GEORGE LEVIE; STENTON
LEIGH CAPITAL CORP.; KATHRYN COWEN
a/k/a KATHRYN BRAITHWAITE; STERLING
TECHNOLOGY PARTNERS; JAMES KELLY;
JOSEPH HUARD; SHAMROCK PARTNERS LTD.;
CAPITAL RESEARCH LTD.; LAURENCE
ISAACSON; L. ISAACSON, INC.; THORNHILL
GROUP, INC.; ROBERT MAUM; JAMES RAKER;
and HEIDI CARENS,

          Defendants.

_____/

## FIRST AMENDED COMPLAINT

### (Jury Trial Demanded)

Plaintiff, the Court-appointed Receiver of Lancer Management Group LLC, Lancer

Management Group II LLC, Lancer Offshore Inc., Omnifund Ltd., LSPV Inc., LSPV LLC,

Alpha Omega Group Inc., and G.H. Associates LLC (collectively, the "Receivership Entities")

and responsible person for Lancer Partners L.P., sues Defendants Michael Lauer, Martin Garvey,

Eric Hauser, David Newman, Milton Barbarosh, George Levie, Stenton Leigh Capital Corp.,

Kathryn Cowen a/k/a Kathryn Braithwaite, Capital Research Ltd., Sterling Technology Partners, James Kelly, Joseph Huard, Shamrock Partners, Ltd., Laurence Isaacson, L. Isaacson, Inc., Thornhill Group, Inc., Robert Maum, James Raker and Heidi Carens, and states:

## I.
## INTRODUCTION

1.      The Receiver brings this action on behalf of the Receivership Entities against Michael Lauer ("Lauer") and his business and personal associates for their actions that caused the hedge funds known as Lancer Offshore, Inc. ("Offshore"), Lancer Partners, L.P. ("Partners"), and Omnifund Ltd. ("Omnifund")[1] to have their assets depleted to enrich Lauer and his cronies. The Receiver was appointed by the Court in connection with a Securities and Exchange Commission ("SEC") enforcement action against Lauer – the manager of the Funds – and Lauer's management companies.  This action is brought on behalf of all the Funds and asserts claims for damages caused directly to the Funds by Lauer and the other Defendants, as opposed to any damages that Lauer and the other Defendants may have caused to the Funds' investors and creditors.

2.      As set forth in detail below, Lauer depleted the Funds by investing millions of dollars in a small number of companies (the "Lancer-Controlled Shells"), such as Nu-D-Zine Bedding & Bath, Inc, SMX Corp., AUG Corp., and Fidelity First Financial Corporation, among other companies.  Shares of the Lancer-Controlled Shells were not listed on any major exchange and were instead traded infrequently on the over-the-counter markets.  Often, the Lancer-Controlled Shells were brought to Lauer's attention by Sterling Partners, Ltd. ("Sterling"),

---

[1] In this Complaint, Omnifund, Offshore, Partners, LSPV Inc., and LSPV LLC will be referred to collectively as the "Funds."   Offshore and Omnifund will be referred to collectively as the "Offshore Funds."

Robert Maum ("Maum"), James Raker ("Raker"), Bruce Cowen ("Cowen"),[2] Laurence Isaacson ("Isaacson"), L. Isaacson, Inc. ("LII"), and Thornhill Group, Inc. ("Thornhill"). In certain instances, Lauer created the façade that they were brought to the Funds through entities that he personally held a stake in, such as Capital Research Ltd. ("Capital Research"), for the purpose of generating additional fees for himself.

3.    Lauer would use the Funds' assets to acquire large and often controlling stakes in the Lancer-Controlled Shells through private transactions to purchase securities with various restrictions on their trading – even though most of the Lancer-Controlled Shells had no earnings or even reasonable prospects for significant earnings. After taking these large, controlling stakes in the Lancer-Controlled Shells, Lauer would often install persons such as Isaacson and Kathryn Cowen a/k/a Kathryn Braithwaite ("Braithwaite") as officers and directors to "operate" the companies.

4.    Lauer would then cause the Funds to pour more and more money into the Lancer-Controlled Shells in return for millions more "restricted" shares – shares that could not be traded freely. Through these transactions, the Funds would pay Cowen, Sterling, Isaacson, Thornhill, and/or Capital Research fees labeled as consulting fees. These "consulting fees" were little more than a way for Cowen, Sterling, Isaacson, Thornhill, and Capital Research to profit individually from the Funds without providing any tangible benefit to the Funds.

5.    In order to create a high purported net asset value ("NAV") for the Funds and at the end of the Funds' respective reporting periods, Lauer would purchase a small number of shares in the Lancer-Controlled Shells in the over-the-counter market, for no apparent legitimate

---

[2] Cowen was a senior analyst for the Funds before his indictment in August of 2002. Cowen also served as a consultant to the Funds, as described in more detail below.

business purpose, and at a price much higher than the original acquisition and historic price. In many cases, these trades were performed for the Funds by Shamrock Partners Ltd. ("Shamrock") and its two main traders, James Kelly ("Kelly") and Joseph Huard ("Huard").

6.     Lauer then took this final trade price from the Funds' own transaction and used that price to value *all* the shares owned by the Funds at that higher price. When necessary to justify these overstated values, Lauer employed his valuation shills – Milton Barbarosh ("Barbarosh"), George Levie ("Levie"), and Stenton-Leigh Capital Corp. ("Stenton-Leigh") – to provide allegedly accurate, but in reality grossly overstated, valuations to auditors and fund administrators.

7.     Taking the NAV's that he manufactured through the manipulative trades, Lauer then claimed that the Funds were extremely "profitable" such that huge management and incentive fees could be extracted from the Funds. These management and incentive fees were then paid to Lauer, Martin Garvey ("Garvey"), and Eric Hauser ("Hauser") – either directly or through the Management Companies. As the "in-house" administrator for the Funds, David Newman ("Newman") ensured that these NAV's were approved by either fund administrators or fund auditors, which all profited themselves from the manipulative trading as well.

8.     Investors contributed approximately $941 million into Offshore and Omnifund, collectively, from the date of their inception to the date of the appointment of the Receiver. Investors contributed an approximate additional $196 million into Partners from the date of its inception to the date of the appointment of the Receiver.

9.     The extraordinary depletion of the Funds' assets would not have occurred but for the actions of all the Defendants working together to ensure their own personal profit and acting to the detriment of the Funds – whether before or after the Receiver was appointed.

10.     For her part, Heidi Carens ("Carens") has aided Lauer in secreting money and other assets away from the Receivership after this Court imposed an asset freeze on Lauer.

11.     As a result of the Defendants' actions, the Funds have been damaged in a number of ways.  First, the Funds paid tens of millions of dollars in artificially high management and incentive fees to Lauer, Garvey, and Hauser; in artificially high administration fees to the Offshore Funds' administrators; in bogus finders' fees, consulting fees, and other fees to Maum, Raker, Sterling, Capital Research, Barbarosh, Levie, Stenton-Leigh, Braithwaite, Isaacson and Bruce Cowen; and in brokerage fees to Shamrock, Kelly, and Huard for trades intended to inflate the Funds' NAV's.  Second, the Funds continued to "invest" in various worthless portfolio companies with claimed values – supported by Barbarosh, Levie, and Stenton-Leigh – that were grossly exaggerated.  Third, the Funds paid out tens of millions of dollars in redemptions of shares based on inflated NAV's.  Fourth, the Funds were kept in operation, solicited additional investor funds, incurred additional obligations in the conduct of their business and disposed of assets long after they were insolvent, thereby deepening the insolvency and the amount of the liabilities that the Funds are now unable to satisfy.

## II.
## THE PARTIES

### A.      The Plaintiff

12.     On July 8, 2003, the SEC filed in this Court a complaint for injunctive and other relief against Lauer and the Receivership Entities in the case styled *SEC v. Michael Lauer, et al.,* Case No. 03-80612-CIV-MARRA (the "Enforcement Action").[3]

---

[3] In or around May, 2003, the Financial Services Commission (the "FSC") brought a similar action in the British Virgin Islands (the "BVI") to enjoin Lauer and the Management Companies from operating the Funds.  The FSC is the BVI equivalent of the SEC.  The FSC agreed to abate its action pending the outcome in the Enforcement Action.

13. On July 10, 2003, this Court entered an Order appointing **Plaintiff as Receiver** ("Receivership Order") for: (i) Lancer Management Group LLC ("**Lancer Management**"); (ii) Lancer Management Group II LLC ("Lancer Management II," collectively, **Lancer Management and Lancer Management II** are referred to as the "Management Companies"); (iii) **Lancer Offshore Inc.** ("Offshore"); (iv) Omnifund Ltd. ("Omnifund"); (v) **LSPV Inc.** ("**Offshore LSPV**"); and (vi) LSPV LLC ("Partners LSPV").[4] The Receiver is an individual resident of the Southern District of Florida by virtue of that appointment.

14. On December 3, 2003, the Court entered an Order reappointing the **Receiver** ("Reappointment Order"). The Receivership Reappointment Order empowers the **Receiver to** bring this action on behalf of the original Receivership Entities.

15. Pursuant to 28 U.S.C. § 754, the Receiver filed a copy of **the Complaint and** Reappointment Order in every United States district within ten (10) days of **the Reappointment** Order.

16. On April 16, 2003, Lancer Partners, L.P. ("Partners") filed a **bankruptcy petition** under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court"). On July 24, 2003, **the Connecticut** Bankruptcy Court entered an Order recognizing the Receiver as the **responsible person for** Partners by virtue of the Receiver's control of Lancer Management II, Partners' **general partner.** The July 24 Order, the Receivership Order and the Reappointment Order empower the **Receiver** to bring this action on behalf of Partners.

---

[4] Offshore, Omnifund, Partners, Offshore LSPV, and Partners LSPV are collectively referred to as the "Funds."

17.     On September 3, 2003, this Court entered an Order extending the terms of the Order Appointing Receiver ("Order Extending Receivership") to include Alpha Omega Group Inc. ("Alpha Omega") and G.H. Associates LLC ("GH"). The Order Extending Receivership empowers the Receiver to bring this action on behalf of Alpha Omega and GH.

**B.**     **The Defendants**

18.     Defendant Lauer is an individual resident of Greenwich, Connecticut.

19.     Defendant Garvey is an individual resident of Essex Falls, NJ.

20.     Defendant Hauser is an individual resident of New York, NY.

21.     Defendant Newman is an individual resident of New Jersey and was a key employee of GH.

22.     Defendant Barbarosh is an individual resident of Boca Raton, FL.

23.     Defendant Levie is an individual resident of Plantation, FL.

24.     Defendant Stenton Leigh is a Florida corporation with its principal place of business in Boca Raton, Florida.  At all relevant times hereto, Barbarosh was the president, a director, and, upon information and belief, the sole owner of Stenton Leigh.

25.     Defendant Braithwaite is an individual resident of San Clemente, CA.

26.     Defendant Sterling is a California limited partnership with its principal place of business in San Juan Capistrano, California.

27.     Defendant Kelly is an individual resident of Newton Square, PA.

28.     Defendant Huard is an individual resident of Lake Worth, FL.

29.     Defendant Shamrock is a Pennsylvania limited partnership with its principal place of business in Media, PA.  At all relevant times hereto, Kelly was the sole owner, president and chief executive officer of Shamrock, and Huard was the executive vice president of Shamrock.

30.     Defendant Capital Research is a Pennsylvania limited partnership with its principal place of business in Media, PA. At all relevant times hereto until 2001, Garvey, Bruce Cowen, Kelly and Alpha Omega each owned 25% of Capital Research. Lauer owned 100% of Alpha Omega. In 2001, Alpha Omega transferred its 25% interest in Capital Research to Bruce Cowen.

31.     Defendant Isaacson is an individual resident of Weston, FL.

32.     Defendant LII is a Florida corporation with its principal place of business in Weston, FL. At all relevant times hereto, Isaacson was the sole owner of LII.

33.     Defendant Thornhill is a Florida corporation with its principal place of business in Weston, FL. At all relevant times hereto, Isaacson was the sole owner of Thornhill.

34.     Defendant Maum is an individual resident of Greenwich, CT.

35.     Defendant Raker is an individual resident of New York, NY.

36.     Defendant Carens is an individual resident of Greenwich, Connecticut.

## III.

## <u>JURISDICTION & VENUE</u>

37.     This Court has original subject matter jurisdiction over all claims at issue in this proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334; and 15 U.S.C. § 78aa. The Court has ancillary and/or supplemental jurisdiction over all claims at issue in this proceeding pursuant to 28 U.S.C. § 1367.

38.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 754, 1334 and 1692; Fla. Stat. §§ 48.193(1) and (2); and Rule 7004(d) of the Federal Rules of Bankruptcy Procedure.

39.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 754, 1391(b), 1409 and 1692.

## IV.
## GENERAL ALLEGATIONS

**A.      Formation And Organization Of The Funds**

**1.      Partners**

40.     In 1993, Lauer formed a New York limited partnership he eventually named Lancer Partners L.P. ("Partners New York").

41.     In November 1997, Lauer formed Partners as a limited partnership under the laws of the State of Connecticut.  Lauer subsequently merged Partners New York into Partners.

42.     Since 1993, investors deposited approximately $196 million into Partners.

43.     Lancer Management II was the general partner and management company for Partners.

44.     Lauer owned 80% of Lancer Management II and was the managing member of Lancer Management II.

45.     Garvey and Hauser each owned 10% of Lancer Management II.

**2.      Offshore**

46.     On September 27, 1995, Lauer incorporated Offshore as an International Business Company ("IBC") under the laws of the British Virgin Islands (the "BVI").  On September 27, 1995, Offshore filed its Memorandum of Association and Articles of Association (the "Offshore Articles") in the BVI. Offshore is the largest of the Funds.

47.     Since September 27, 1995, investors deposited approximately $893 million into Offshore.

48.     Lancer Management was the management company for Offshore.

49.     Lauer owned 80% of Lancer Management and was the **managing member of** Lancer Management.

50.     Garvey and Hauser each owned 10% of Lancer Management.

### 3.     Omnifund

51.     On January 29, 1999, Lauer incorporated the Orbiter Fund, Ltd. ("Orbiter") as an IBC in the BVI.

52.     On September 30, 1999, Lauer incorporated the Viator Fund ("Viator") as an IBC in the BVI.

53.     On April 2, 2002, Lauer formed Omnifund as an IBC in **the BVI by merging** Orbiter and Viator.[5]

54.     On April 2, 2002, Omnifund filed its Memorandum of Association and Articles of Association (the "Omnifund Articles") in the BVI.

55.     Since January 29, 1999, investors deposited approximately $48,632,450 into Omnifund and its predecessors, Orbiter and Viator.

56.     Lancer Management was the management company for Omnifund.

## B.     THE MANAGEMENT AND INCENTIVE FEES

57.     The Funds were operated as open-end investment funds.   **In an open-end** investment fund, investors purchase and redeem shares based on the net asset **value per share** ("NAV/share") of the fund.

58.     The net asset value ("NAV") of a fund is the total value of all of the securities held by the fund.

---

[5] Omnifund. Orbiter, and Viator are collectively referred to as "Omnifund."

59.     Unlike the share price of companies traded on national stock exchanges, the share price of an open-end investment fund does do not fluctuate based on the supply and demand for the fund's shares. Instead, the share price of an open-end investment fund is based on the total NAV of the fund's holdings on the date of calculation divided by the number of shares the fund has issued to investors.

60.     On November 24, 1997, Partners entered a Limited Partnership Agreement with Lancer Management II (the "Partnership Agreement") which provides that Partners shall pay Lancer Management II – Lauer, Garvey, and Hauser – (i) a management fee of approximately 1% per year, calculated by multiplying Partners' NAV at the end of each fiscal quarter by 0.25%,[6] plus (ii) an incentive fee of approximately 20% of the net profits of Partners, including any unrealized gain, as calculated on the last day of Partners' fiscal year.

61.     On January 1, 1998, Offshore entered into an Amended and Restated Investment Management Agreement with Lancer Management (the "Offshore Management Agreement") which provides that Offshore shall pay Lancer Management – again, Lauer, Garvey, and Hauser – (i) a management fee of approximately 1% per year, calculated by multiplying Offshore's NAV at the beginning of each fiscal quarter by 0.25%, plus (ii) an incentive fee of approximately 20% of the net profits of Offshore, including any unrealized gain, as calculated on the last day of Offshore's fiscal year.

62.     On March 27, 2002, Omnifund entered into an Investment Management Agreement with Lancer Management (the "Omnifund Management Agreement"),[7] which

---

[6]  Before November of 1997, Partners New York paid management fees directly to Lauer rather than through Lancer Management II.

[7]  Collectively, the Partnership Agreement, Offshore Management Agreement, and Omnifund Management Agreement are referred to as the "Management Agreements".

provides that Omnifund shall pay Lancer Management – once again, Lauer, Garvey, and Hauser – (i) a management fee of approximately 2% per year, calculated by multiplying Offshore's NAV's at the beginning of each fiscal quarter by 0.5%, plus (ii) an incentive fee of approximately 25% of the net profits of Omnifund, including any unrealized gain, as calculated on the last day of Omnifund's fiscal year.[8]

63.    This fee structure gave Lauer, Garvey, and Hauser the incentive to artificially inflate the Funds' stated NAV at the end of each of the Funds' fiscal quarters and at year-end, when fees would be calculated.    The greater the NAV's of the Funds, the greater the management fees payable to Lauer, Garvey, and Hauser.    Similarly, as the NAV of the Funds increased, the higher the "profits" that the Funds could claim, and the higher the incentive fees payable to Lauer, Garvey, and Hauser.    Also, by artificially inflating the NAV's, Lauer could market the Funds to potential new investors by claiming a "proven track record" of high returns on each investment, and encourage existing investors to keep their money with the Funds instead of redeeming their shares.

## C.    FIDUCIARY AND OTHER DUTIES

### 1.    Fiduciary Duties of Officers and Directors

64.    Lauer, Garvey, Hauser, and Raker (collectively, the "Officers and Directors") were officers and directors of the Funds.

---

[8] Before Orbiter and Viator merged into Omnifund and for Orbiter, Lancer Management received (i) a management fee for managing Orbiter of approximately 1.5% per year, which was calculated by multiplying Orbiter's NAV at the beginning of each fiscal quarter by 0.375%, plus (ii) an incentive fee of approximately 50% of the net profits of Orbiter, including any unrealized gain, as calculated on the last day of Orbiter's fiscal year. For Viator, Lancer Management received (i) a management fee for managing Viator of approximately 1% per year, which was calculated by multiplying Viator's NAV at the beginning of each fiscal quarter by 0.25%, plus (ii) an incentive fee of approximately 25% of the net profits of Viator, including any unrealized gain, as calculated on the last day of Viator's fiscal year.

65.     As the managing member of the Management Companies, Lauer was the investment manager for the Funds.

66.     As officers and directors of the Funds – and as investment manager in Lauer's case – Lauer, Garvey, Hauser, and Raker owed a number of fiduciary duties (the "Fiduciary Duties") to the Funds, including: (a) a duty to invest in securities for the Funds in accordance with the Funds' stated investment goals; (b) a duty to fairly value the securities of the Funds; (c) a duty not to act in their own interests to the detriment of the Funds; (d) a duty not to usurp business opportunities of the Funds; and (e) a general duty of care to act prudently and in the best interests of the Funds.

### a.     Duty to Invest in Securities in accordance with Stated Goals

67.     The Management Agreements and applicable law obligated Lauer, as the investment manager, to choose the securities in which the Funds invested in accordance with the investment strategies and limitations represented to investors.

68.     Lauer solicited investors for the Funds through, among other means, the use of private placement memoranda ("PPM") describing the Funds' investment strategies and limitations.

69.     The PPM issued by Partners (the "Partners PPM") describes Partners' investment objective as seeking "high economic return primarily through capital appreciation while attempting to control risk."

70.     The Partners PPM provides for certain investment restrictions for Partners, namely that "[t]he Limited Partners, by pooling their assets in the Partnership, will be able to invest their funds in a diversified portfolio of securities managed by the General Partner that is seeking to maximize return while controlling risk."

- 13 -

71.     The PPM issued by Offshore (the "Offshore PPM") describes Offshore's investment objective as "an analytical discipline concentrating on underlying corporate value with an added emphasis on anticipatory timing of future corporate developments, primarily in small and middle capitalized companies."

72.     The Offshore PPM provides for certain investment restrictions for Offshore including, among other things, that: (a) no more than 20% of the gross NAV of the Fund may be loaned to or invested in the securities of one issuer, and (b) Offshore may not take or seek to take de facto or actual management control of the issuer of any of its underlying investments.

**b.     Duty to Value Securities Fairly**

73.     Lauer, Garvey, and Hauser were charged with the duty to value fairly the securities the Funds held.   The management and incentive fees due to the Management Companies, the payments to investors redeeming their shares in the Funds, and the Funds' performance claims used to lure new investors to the Funds all depended on fair valuation.

74.     Because Lauer allegedly believed that other brokers and traders would try to undermine the Funds' investments if the Funds' holdings were made public, Lauer refused to tell even the Funds' own investors what companies were included in the Funds' portfolios.   As a result, the investors could not monitor Lauer's valuation of the Funds' NAV's independently.

75.     The Partnership Agreement, the Offshore Articles, and the Omnifund Articles accordingly provide rules for the calculation of the Funds' NAV's.

76.     The Partnership Agreement, the Offshore Articles, and the Omnifund PPM provide that the Funds would value securities in accordance with generally accepted accounting principles in the United States ("GAAP").

77.     The Partnership Agreement, the Offshore Articles, and the Omnifund Articles further provide that if a security held by one of the Funds was listed on a national stock exchange – such as the New York Stock Exchange, the American Stock Exchange, or the NASDAQ exchange – then the value of the security would be determined by the securities' closing price on the last day of the period for which the NAV was being calculated.

78.     The Offshore Articles and the Omnifund Articles also provide that if a security held by one of the Funds was not listed on one of the national stock exchanges, the board of directors of the particular Fund, in consultation with Lauer, would determine the value at which the security should be carried.

79.     The Partnership Agreement provides that if a security held by one of the Funds was not listed on one of the national stock exchanges, Lancer Management II would value the security based on the accrual basis of accounting in accordance with GAAP and at a reasonable value determined by the general partner.

80.     The Partnership Agreement, the Offshore Articles, and the Omnifund Articles all impose the duty to ascribe a "fair value" to the securities held by the Funds.

### c.     **Other Fiduciary Duties**

81.     In addition, the Officers and Directors had a general duty of care to act prudently and in the best interests of the Funds, and not to act in their own interests to the detriment of the Funds, and not to usurp business opportunities of the Funds.

### 2.     **Duty of Care of Valuation Specialists**

82.     Barbarosh, Stenton Leigh, and Levie provided business valuation and appraisal services to the Funds.

83.    On information and belief, Barbarosh was the president, sole director, and sole owner of Stenton Leigh – the vehicle through which Barbarosh performed business valuation and appraisal services – at all times relevant hereto.

84.    In providing these services, Barbarosh, Stenton Leigh, and Levie each owed a duty of professional care to the Funds that is dictated by the American Appraisal Standards Board ("ASB").

a.    <u>Uniform Standards of Professional Appraisal Practice</u>

85.    The ASB promulgates professional standards for appraisal practitioners set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP").

86.    Barbarosh, Stenton Leigh, and Levie agreed to perform valuation services on behalf of the Funds in accordance with the USPAP.  Indeed, the valuations prepared by Barbarosh, Stenton Leigh, and Levie contained the following statement: "[T]his Valuation Analysis Memorandum analyzes the appropriate approach to value…as required under USPAP."

87.    In addition, Barbarosh and Levie held themselves out as being certified by the American Society of Appraisers ("ASA").  In their resumes and valuations, Barbarosh and Levie indicated the professional designation "ASA" next to their names.   As certified ASA practitioners, Barbarosh and Levie are required to adhere to USPAP standards.

88.    Under the USPAP, an appraiser: (a) must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests; (b) may not accept payment of undisclosed fees, commissions, or things of value in connection with the procurement of an assignment; (c) must not render appraisal services in a careless or negligent manner; (d) must use diligence and care in preparing the appraisal; and (e) must include a signed certification stating that (i) the practitioner has no present or prospective interest in the property

- 16 -

that is subject to the report; (ii) has no personal interest with respect to the parties involved; and (iii) has no bias with respect to the property that is the subject of the report or to the parties involved with the assignment.

### b.   National Association of Certified Valuation Analysts

89.    As certified valuation analysts, Barbarosh and Levie also owed duties of professional care articulated by the National Association of Certified Valuation Analysts ("NACVA").

90.    Under the NACVA guidelines, a valuation professional: (a) shall remain objective, apply professional integrity, shall not knowingly misrepresent facts or subrogate judgment to others; (b) must not act in a manner that is misleading; (c) must exercise due professional care in performance of services, including completing sufficient research and obtaining adequate documentation; (d) must act independently when performing valuation services; and (e) must disclose to his or her client any financial interests in the business entity being valued in the report.

### c.   Duty of Care of Other Professionals

91.    Shamrock was a brokerage firm licensed by the National Association of Securities Dealers. Shamrock executed thousand of trades on the Funds' behalf by serving as a "market maker" in several thinly traded portfolio companies.[9]   As noted above, Kelly was the sole owner, president and chief executive officer of Shamrock; Huard was the executive vice president of Shamrock; and they each also acted as market makers and brokers for the Funds.

_____

[9] A market maker is a "broker-dealer" that accepts the risk of holding a certain number of shares of a particular security to facilitate trading in that security.  A market maker competes for customer order flow by displaying buy and sell quotations for a guaranteed number of shares of a particular company.  Once an order is received, the market maker immediately sells from its own inventory or seeks an offsetting order.  "Making a market" refers to an action whereby a dealer stands ready, willing and able to buy or sell a particular security at the quoted bid and ask price.

92.     Sterling, Capital Research, Isaacson, LII, Thornhill, **Maum and Raker**[10] purportedly provided investment banking, consulting, or other financial services to the Funds.

93.     Bruce Cowen ("Cowen") was the sole equity partner of Sterling.

94.     Cowen, Kelly, and Garvey each owned a 25% equity interest in **Capital Research**. Lauer also owned a 25% stake in Capital Research through his wholly owned **company, Alpha** Omega, until he sold his interest to Cowen in or about December of 2001.

95.     Isaacson was the sole shareholder of LII and Thornhill.

96.     As professionals *purportedly providing* services to the Funds, Shamrock, Kelly, Huard, Braithwaite, Sterling, Capital Research, Garvey, Isaacson, LII, Thornhill, **Maum, Raker,** Barbarosh, Stenton-Leigh, and Levie owed duties of general and professional **care to the Funds.**

**D.      THE SCHEME**

**1.      A General Description of How Lauer Breached His Fiduciary Duties**
         **and Depleted the Funds by Hundreds of Millions of Dollars**

97.     Lauer was the kingpin who masterminded the scheme to bilk **the Funds out of tens** of million dollars and deplete the Funds by hundreds of millions of dollars.

98.     In general terms, Lauer took advantage of his position as the Funds' investment manager.  Contrary to his duties, Lauer caused the Funds to pursue a risky **investment strategy** designed to artificially inflate his management and incentive fees rather than to **create true value** for the Funds, and at the same time, maintain his lifestyle of racing cars in road races and jetting around the country in the private jet bought with money from the Funds.

99.     The Funds' PPM represented that "[t]he majority of the common stocks in which the Funds have and intend to invest are traded on the New York Stock Exchange, the American

_____

[10] As noted, Raker also served as Chief Financial Officer of the Funds.

Stock Exchange or in over-the-counter market in the United States." However, beginning at least as early as 2000, but possibly as early as 1997, Lauer caused the Funds to focus almost exclusively on small and micro-cap stocks with poor fundamentals that were traded on the over the counter market because these companies could not meet listing requirements for the NYSE, AMEX, or NASDAQ markets.

100.    For each of the years from 1997 until 2003, the great majority of the Funds' trading activity was for securities traded on the OTC markets, as opposed to the NYSE, NASDAQ or AMEX. Many of these securities were in thinly traded shell companies, with little-to-no earnings, operations, or growth prospects.

101.    Lauer's interest in these shell companies and his depletion of the Funds by pouring money into them was not a result of any fundamental value in their respective businesses. Rather, Lauer depleted the Funds by causing them to invest in shell companies to further his own interests, and the interests of the other Defendants herein.

102.    As discussed more fully below, Lauer used the Lancer-Controlled Shells, such as Nu-D-Zine Bedding & Bath, Inc, SMX Corp., AUG Corp., and Fidelity First Financial Corporation, to inflate the purported NAV for each of the Funds, thereby inflating the management and incentive fees paid to Lauer, Garvey, and Hauser.

103.    Lauer pumped up the purported value of the Funds' holdings in these Lancer-Controlled Shells by causing the Funds to acquire large blocks of restricted stock (stock that generally cannot be sold on public markets under applicable securities laws) or other securities in private transactions, often paying only pennies per share.

104.    Lauer would then, directly or indirectly, make manipulative trades in a comparatively insignificant amount of the unrestricted, publicly traded stock of these Lancer-

Controlled Shells.  At the end of the quarter or year when management and incentive fees were calculated, Lauer would place orders for small numbers of shares in the thinly traded Lancer-Controlled Shells, at prices much higher than he paid in private transactions.  Often these orders would be the only retail transactions in shares of the Lancer-Controlled Shells during that day.  In some instances, they would be the only trades in that stock for the entire month.  The price Lauer caused the Funds to pay for the publicly traded shares would be reported by the OTC pricing services.

105.    Lauer would then use this "last trade price" as the per share value of the Lancer-Controlled Shells, and project that value onto *all* shares of the Lancer-Controlled Shells held by the Funds, including the large blocks of restricted stock acquired in private transactions for only pennies per share.

106.    Lauer's conduct had the effect of greatly inflating the values assigned to the Funds' portfolios.  For instance, while the total amount Offshore paid to purchase the securities in its portfolio as of December 31, 2000, was $274,967,678, the market value Lauer claimed for NAV purposes was $711,487,556.  Similarly, while the amount Offshore paid to purchase the securities in its portfolio as of December 31, 2001, was $261,908,110, the market value Lauer claimed for NAV purposes was $830,293,002.  This unrealized increase in value was not based on any actual increase in value in the Offshore portfolio, but resulted from Lauer's NAV manipulation.

107.    Significantly, the inflated NAV's for the Funds in turn inflated the fees payable to Lauer, Garvey and Hauser.  Lauer's conduct resulted in the overpayment of management and incentive fees in the tens of millions of dollars.  These "false profit" fee payments harmed the Funds by draining them of real value.  Once reported to investors, these inflated values also leant

credibility to Lauer and prolonged the life of the Funds, despite hopeless and deepening insolvency, primarily for the purpose of generating fees payable to Lauer, Garvey, Hauser, and others, as described below.

108.    Lauer was not satisfied with bilking the Funds by dramatically inflating his management and incentive fees. He also formed corporations that he either owned by himself or in which he held a substantial interest to funnel additional monies from the Funds to himself.

109.    One such entity was Alpha Omega. Lauer owned 100% of Alpha Omega. He would often cause the Funds to transfer assets to Alpha Omega, or alternatively, purchase assets using the Funds' money in the name of Alpha Omega – such as a Cessna airplane.

110.    Another such entity was Capital Research, Inc. Alpha Omega – in other words, Lauer – owned 25% of Capital Research.[11] Lauer would often cause the Funds to pay Capital Research sham consulting fees for finding companies in which the Funds would invest. As the investment manager of the Funds getting paid millions of dollars to pick investments for the Funds, Lauer was not entitled to receive additional money as a consultant. Yet, he caused the Funds to pay him additional money through Capital Research.

111.    In addition, Lauer caused the Funds to enter into contracts with service providers, such as the Offshore Funds' administrator, Citco Fund Services (Curacao), N.V. ("Citco"), for which the service provider's fees were based on the Funds' NAV's. By doing so, Lauer gave these service providers the incentive to overstate the Funds' NAV's or to turn a blind eye towards Lauer's inflation of the NAV's. Furthermore, when Lauer caused the Funds to inflate their NAV's, Lauer also inflated the fees payable to these services providers.

---

[11] Garvey, Cowen and Kelly each owned 25% of Capital Research as well.

### 2.     A General Description of How the Co-Defendants[12] Breached Their Duties, Aided and Abetted Lauer's Breaches of Duties, and Depleted the Funds by Hundreds of Millions of Dollars

112.    Lauer did not perpetrate this scheme on his own.  Rather, Lauer worked in concert with a group of other purported professionals who helped him to: manage and administer the Funds to deceive investors, prepare overstated valuations of the Lancer-Controlled Shells, manufacture trades in the Lancer-Controlled Shells to artificially inflate the purported value of the Funds' holdings, "find" and extend the lifespan of the Lancer-Controlled Shells, and prepare overstated valuations of the Lancer-Controlled Shells.

### a.     The Officers, Directors, and Employees: Garvey, Hauser, and Newman

113.    Garvey and Hauser were officers and directors of the Funds, and helped Lauer manage and administer the Funds to deceive investors.

114.    As discussed below, Garvey and Hauser aided and abetted Lauer's fiduciary breaches, and breached their own fiduciary duties to the Funds, by distributing false information to investors and service providers of the Funds; helping Lauer select which shell companies the Funds should invest in; executing sham trades directed by Lauer; and generally assisting Lauer in manipulating the Funds' NAV's.

115.    Garvey and Hauser each owned 10% of the Management Companies.  As such, Garvey and Hauser had a significant incentive to help Lauer inflate the Funds' NAV's artificially and to hide this scheme from investors and the public.

116.    Like Lauer, Garvey was not satisfied with draining the Funds through artificially inflating his management and incentive fees.  Garvey, too, was a 25% owner of Capital

---

[12] This section does not address Carens' role.  As Lauer's wife, she played a distinctive role in aiding and abetting Lauer's violations of this Court's Orders, as described below.

Research.  As noted, Capital Research received sham consulting fees for finding companies in which the Funds would invest.

117.   Newman was a key employee of the Funds.  Newman also aided and abetted Lauer's fiduciary breaches by assisting Lauer in Lauer's scheme to artificially inflate the Funds' NAV's.  Among other things, Newman placed manipulative trades as directed by Lauer, wired funds to the Lancer-Controlled Shells selected for use as NAV-inflation vehicles, provided information regarding the private transactions entered into by the Funds to the Funds' prime broker, calculated the inflated management and incentive fees, and signed off on and provided NAV statements to the Funds' investors, knowing that those statements were false.

### b.   The Market Makers: Shamrock, Kelly, and Huard

118.   Shamrock, Kelly, and Huard also aided and abetted Lauer's fiduciary breaches, and breached their own duties of professional care to the Funds, by acting as market makers in certain of the Lancer-Controlled Shells.

119.   As market makers in certain of the Lancer-Controlled Shells, Shamrock, through Kelly and Huard, set artificially high bid prices for those companies.  Lauer then used those inflated bid prices to value all of the shares in those companies owned by the Funds.

120.   In addition to being a market maker, Shamrock was a securities broker licensed by and registered with the National Association of Securities Dealers, Inc. ("NASD").  As an NASD registered broker, Shamrock and the brokers who worked there, including Kelly and Huard, were subject to the NASD's "best execution rule."  The "best execution rule" mandates the execution of transactions on behalf of customers at the best possible price: that is, the broker is required to buy securities for its customer at the lowest available price, and to sell securities for its customer at the highest available price.

121.     In addition to its role as a market maker, Shamrock, through **Kelly and Huard,** acted as executing brokers for the funds.

122.     Upon information and belief, when acting as an executing broker for the Funds, Shamrock, Kelly, and Huard violated the "best execution rule" by executing "buy" orders for the Funds at a price higher than the lowest available price. In doing so, Shamrock, **Kelly,** and Huard helped Lauer justify artificially high values for those selected shell companies, thereby enabling Lauer to inflate his, Garvey's, and Hauser's management and incentive fees.

123.     Shamrock, Kelly, and Huard also benefited personally from assisting Lauer. First, because Shamrock was willing to violate NASD regulations to assist Lauer in manipulating the price of the Lancer-Controlled Shells, the Funds executed a substantial number of trades through Shamrock, generating significant brokerage fees for Shamrock; indeed, the Funds were Shamrock's biggest client. Second, Kelly joined Lauer, Garvey, and Bruce Cowen as equal 25% shareholders of Capital Research and generated substantial bogus consulting fees.

124.     At a February 7, 2005 deposition taken of Huard in connection with the case styled *Hannah Hempstead v. Total Film Group, Inc.*,[13] Huard admitted his and Shamrock's roles in Lauer's scheme. Huard testified that through Shamrock, he would purchase certain stock on behalf of the Funds from other brokers who "made a market" in that stock, which had the effect of driving up the price of that stock.

125.     Huard further testified that the trades made for the Funds were timed for the last day of the month, at the end of the trading day, to drive up the price of the stock, which enabled Lauer to report higher NAV's to the Funds' investors.

---

[13] This case was brought in the Superior Court of the State of California for the County of Los Angeles, Case No. SC 071112. Total Film Group, Inc. was yet another Lancer-Controlled Shell.

     c.     **The Appraisers: Barbarosh, Levie, and Stenton Leigh**

126.    Barbarosh, Levie, and Stenton Leigh also aided and abetted Lauer's fiduciary breaches, and, in preparing appraisals of certain of the Lancer-Controlled Shells, breached their own duties of professional care as certified appraisers.

127.    In order to generate fees for performing the appraisals, and mindful of Lauer's goals in requesting the appraisals, Barbarosh, Levie, and Stenton Leigh dramatically overstated the value of the Lancer-Controlled Shells. They acted in a misleading manner and either failed to perform sufficient research and obtain adequate information to prepare their appraisals, or acted negligently and carelessly by misapplying the facts.

128.    In certain instances, Barbarosh had a financial interest in the companies he was valuing and, therefore, had a conflict in preparing the appraisals. By overstating the value of the Lancer-Controlled Shells he appraised, Barbarosh justified Lauer's artificial inflation of those company's share prices and created the opportunity for himself to sell stock he owned in those companies at artificially high prices.

129.    Barbarosh was an officer or director of certain Lancer-Controlled Shells he appraised. By preparing artificially high appraisals, Barbarosh justified the Funds' investment of a significant sum of money into the shell. This, in turn, extended the lifespan of the shell and Barbarosh's tenure as an officer or director of the shell, and also provided the shell with money to pay Barbarosh's fees for acting as an officer or director. In other words, in certain instances, Barbarosh effectively received undisclosed fees in connection with his retention as an appraiser.

130.    In certain instances Barbarosh and Stenton Leigh even shared office space and a phone number with the Lancer-Controlled Shells they were valuing for the Funds.

131.    In connection with the FSC Action,[14] the FSC commissioned **Deloitte & Touche** ("Deloitte") to, among other things, assess the financial condition of the Funds.

132.    Deloitte prepared a Report to the FSC analyzing the Stenton **Leigh valuations** (the "Deloitte Report").

133.    The Deloitte Report cited various problems with the Stenton **Leigh valuations.** Specifically, Deloitte found that:

a.    Stenton Leigh was not independent of the Funds because **Stenton Leigh** retained an ownership interest in various Fund holdings;

b.    two of the top 10 companies in which the Funds invested listed the same address as Stenton Leigh;

c.    Stenton Leigh "misapplied the market approach to **arrive at a significantly** large value" for the Funds;

d.    Barbarosh erroneously concluded that a tangible book value **multiple of 30** times was appropriate for Coriander, one of the Funds' holdings;

e.    Coriander was valued by Stenton Leigh at an amount **greater than the** carrying value in the Funds' portfolios; and,

f.    Stenton Leigh improperly added a control premium to its Discounted **Cash** Flow valuation.

134.    The Deloitte Report only addresses a portion of the problems with the Stenton Leigh valuations, and many other problems with the valuations are described below.

135.    Levie also prepared sham valuations for the Funds.

_____

[14] *See supra,* footnote 3, for a description of the FSC Action.

- 26 -

136.    In certain instances, rather than conducting an independent investigation of the Lancer-Controlled Shells he appraised, Levie relied on "research" Barbarosh allegedly performed, even though Levie knew or should have known that Barbarosh held a financial interest in several of the Lancer-Controlled Shells being valued.

137.    Armed with the false appraisals prepared by Barbarosh, Levie, and Stenton Leigh, Lauer was able to justify the absurdly high valuations for various Lancer-Controlled Shells, significantly inflate the Funds' stated NAV's, and, in turn, inflate the management and incentive fees paid to Lauer, Garvey, and Hauser.

### d.    The Consultants: Braithwaite, Sterling, Isaacson, LII, Thornhill, Maum, Raker, and Capital Research

138.    Braithwaite, Sterling, Isaacson, LII, Thornhill, Maum, Raker and Capital Research[15] (collectively, the "Consultants") aided and abetted Lauer's fiduciary breaches, and breached their own duty of professional care to the Funds, in the course of providing "consulting" services to the Funds.

139.    The Consultants were paid substantial fees for finding companies in which the Funds could invest. In certain instances, the Funds paid fees to the Consultants directly. In other instances, the companies in which the Funds invested – the "found" companies – paid fees to the Consultants, typically with money that the Funds invested into that company.

140.    While the concept of a "finder" is not in and of itself corrupt, the role played by the Consultants in this case was. The Consultants did not locate independent companies with existing operations and significant potential for growth. Instead, they located shell companies with no operations and little potential for growth.

---

[15] As of December 31, 2002, Raker also served as the chief financial officer of the Funds, and therefore owed fiduciary duties to the Funds as an officer.

141.    More troubling, the Consultants frequently located shell companies in which they were themselves officers, directors, owners, shareholders, or in which they had some other significant interest.  The Consultants had a self-interest in raising money for those companies, because the money raised from the Funds could be used to pay their salaries or otherwise benefit them financially.  Thus, rather than exercising their duty of professional care to the Funds by directing the Funds to independent companies, the Consultants directed the Funds to companies in which they had personal financial interests.

142.    Furthermore, upon information and belief, the Consultants also benefited by selling their own stock in certain Lancer-Controlled Shells, whose share prices Lauer had helped to inflate.

143.    Lauer, of course, did not care whether the companies brought to him by the Consultants had true growth potential.  Lauer was instead concerned with finding public shell companies in which he could purchase millions of shares of restricted stock for pennies per share, and then carefully time a subsequent purchase of a minimal number of unrestricted shares in those companies at a much higher price, enabling him to perpetuate his scheme to grossly overstate the Funds' NAV's.

**2.    Specific Examples of How Lauer and the Co-Defendants Breached Their Duties, Aided and Abetted Each Others' Breaches of Duties and Depleted the Funds by Hundreds of Millions of Dollars**

144.    The following examples illustrate how Lauer and the Co-Defendants breached their duties, aided and abetted each others' breaches of duties and depleted the Funds by hundreds of millions of dollars.

a.    **Nu-D-Zine/XtraCard**

i.    **The Role of the Officers and Directors**

145.    One of the Lancer-Controlled Shells into which Lauer caused the Funds to pour money for the purpose of dramatically inflating the Funds' NAV's, and his own management and incentive fees, was Nu-D-Zine Bedding & Bath, Inc. ("Nu-D-Zine").

146.    As of December of 2000, Nu-D-Zine had no operations, no revenues and total assets of only $354,128.  In addition, it was a non-reporting company; that is, it was a company that did not file quarterly or annual reports with the SEC, did not file any publicly available financial information, and was not traded on a national stock exchange such as the NYSE, NASDAQ, or AMEX.

147.    On December 26, 2000, Bruce Cowen, a person named in the Offshore PPM as making investment decisions for the Offshore Funds, sent the following memo to Lauer and Garvey via facsimile (the "Dec. 26th Cowen Fax"):

| | |
|---|---|
| To: Michael Lauer | From: Bruce Cowen |
| | Date:  12/26/00 |
| Re: Purchase of Shell (NUDZ) | cc:    Martin Garvey |

We signed a term sheet to purchase ~ 94.5% of NUDZ for $400,000.  I'm pushing for a closing on Wednesday or Thursday.   Terms of the transaction are as follows:

| | |
|---|---|
| Name of Company: | Nu-D-Zine Bedding & Bath, Inc. |
| Pink Sheet Symbol: | NUDZ |
| Authorized Shares: | 50 million |
| Outstanding Shares: | 11,535,898 |
| Shares to be Purchased: | 10,900,000 |
| Remaining Float: | 635,898 |
| Inside Market: | $.155 bid        $.625 ask |
| Market Makers: | Alexander |
| | Paragon |
| | Herzog |
| | Knight |

- 29 -

|                          | Hill Thompson                                           |
|--------------------------|--------------------------------------------------------|
|                          | Shamrock (I had them enter today on the bid)           |
| Market Analysis:         | Hill is on the offer at $.625, than [sic] the stock goes $1.05 by Paragon |
| Purchase Price Per Share: | $.0367                                                |

Strategy:

1. Complete above purchase Wed/Thurs.

2. Fund the Company with $300,000 Friday and receive the following:

   30 million shares @ $.01

   20 million warrants @ $.03

   20 million warrants @ $.05

3. Move the offer or close year at $.625

4. With stock closing at $.625, $700,000 investment has market value of $48,962,500.

5. For each $.01 closing over 5/8 has impact of $809,000.

6. Also, determining if any of the remaining 635,898 remaining shares can be purchased in a block

Michael, I'm pushing hard to get this done this week and hope to be successful.  We will do a reverse split in January, similar to SMX.

Regards,

Bruce

148.    In summary, Cowen sent Lauer and Garvey a memo describing the strategy to purchase 10,900,000 restricted shares of Nu-D-Zine, representing approximately 94.5% of the outstanding shares of the company – a controlling interest in the company despite the restrictions in the Offshore PPM– for a total of $400,000, and thereafter, infuse $300,000 into the company for additional shares and warrants.

- 30 -

149.    Cowen recommended that, within five days, they "move" the value the restricted stock to \$.625/share, reflecting the intent to manipulate the price of the stock upwards, so that the Funds' \$700,000 investment in Nu-D-Zine would be valued at \$48,962,500 for the purpose of determining the Funds' NAV's and Lauer's, Garvey's, and Hauser's management and incentive fees.

150.    Cowen's memo recommends that Lauer direct the Funds to take this course of action during the last week of December – the end of a fiscal quarter and year when the NAV's created by Lauer would be used to calculate the management and incentive fees paid to Lauer, Garvey, and Hauser.

151.    Lauer and Garvey took the advice of Cowen and executed the Nu-D-Zine scheme to perfection.

152.    As of December 31, 2000, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of \$51,329,445, just 2 business days after Offshore paid only \$432,112.10 for these shares.

153.    As of December 31, 2000, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of \$19,385,742.19, just 2 business days after Partners paid only \$325,000 for these shares.

154.    Between Offshore and Partners, Lauer ascribed a total of approximately \$70,000,000 to Nu-D-Zine even though (a) the Funds invested only \$757,112.10 for these shares just 2 business days earlier, and (b) Nu-D-Zine had no revenues, no operations and total assets of only \$354,128 in 2000.

155.    During 2001, the Funds continued pouring money into Nu-D-Zine and received more restricted shares in return.

156.    As of December 31, 2001, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of $138,570,918, even though Offshore paid only $1,281,709.85 for these shares.

157.    As of December 31, 2001, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of $59,601,995 even though Partners paid only $508,681 total for these shares.

158.    As of December 31, 2002, Offshore held stock and warrants in Nu-D-Zine which Lauer valued at a total of $158,558,720 even though Offshore paid only $1,312,320.03 total for these shares.

159.    As of December 31, 2002, Partners held stock and warrants in Nu-D-Zine which Lauer valued at a total of $76,954,200 even though Partners paid only $538,354.26 total for these shares.

160.    Cowen, Lauer and Garvey did not act alone in perpetrating the Nu-D-Zine scheme. They received the help of many of the Co-defendants herein who, like Lauer and Garvey, benefited financially from the scheme.

## ii.    The Role of the Market Makers

161.    Cowen's memo notes that "[he] had [Shamrock] enter on the bid," reflecting his intent to have Shamrock assist Lauer in manipulating the price of the stock. Shamrock thereafter executed the manipulative trades of Nu-D-Zine on December 28th, 29th, and 30th, 2000, earning significant fees in the process.

## iii.    The Role of the Appraisers

162.   In addition, Lauer caused the Funds to retain Barbarosh and Stenton Leigh in early 2002 to perform bogus appraisals of Nu-D-Zine to justify the absurdly high values he ascribed to the Funds' holdings in Nu-D-Zine.

163.   As of December 31, 2001, Barbarosh, through his company Stenton Leigh Business Resources, Inc. ("SLBR"), owned 550,000 shares of common stock in Nu-D-Zine, and Barbarosh and his wife Ricki collectively owned an additional 207,778 shares.

164.   Stenton Leigh and Nu-D-Zine also shared the same business address.

165.   Despite Barbarosh's financial interest in and relationship to Nu-D-Zine, Barbarosh and Stenton Leigh prepared valuation reports of the Fund's holdings in Nu-D-Zine, as of December 31, 2001 (the "Nu-D-Zine Valuations").

166.   In preparing the Nu-D-Zine Valuations, Barbarosh and Stenton Leigh owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

167.   Barbarosh and Stenton Leigh breached these duties by, among other things, significantly overstating the true value of Nu-D-Zine.

168.   As of the effective date of the valuation, Nu-D-Zine was essentially a shell corporation with little to no revenues, little to no operations, and assets of only $1.4 million. Yet, in the Nu-D-Zine Valuation, Barbarosh and Stenton Leigh state that Offshore's holdings in Nu-D-Zine had a value $139.4 million.

169.   Barbarosh's and Stenton Leigh's appraisal had no basis in reality, and was performed for the purpose of aiding Lauer's scheme to artificially inflate the NAV's of the Funds, and so that Barbarosh and Stenton-Leigh could earn substantial valuation fees.

170. In addition, and to the extent Barbarosh could sell Nu-D-Zine stock he owned both individually and through SLBR, he stood to reap further financial rewards since Lauer artificially inflated the price of the publicly traded stock.

171. In November, 2002, Nu-D-Zine merged with an entity called XtraCard Corp., Inc. ("XtraCard"). XtraCard was the surviving entity.

172. Lauer caused the Funds to retain Levie in early 2003 to prepare bogus appraisals of XtraCard to justify the already inflated values he had ascribed to the Funds' holdings in XtraCard.

173. Levie prepared a valuation of XtraCard as of December 31, 2002 (the "XtraCard Valuation").

174. In preparing the XtraCard Valuation, Levie owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

175. Levie breached those duties by, among other things, significantly overstating the true value of XtraCard.

176. As of December 31, 2002, XtraCard had only $1,866,600 in assets and suffered a net loss of $1,792,102 based on $152,407 in revenues against $1,944,509 in expenses. Yet, in his appraisal, Levie valued the Funds' holdings in XtraCard as of December 31, 2002 at $132,466,000.

177. Instead of conducting a truly independent valuation of XtraCard, Levie deliberately relied on figures and information provided to him by Barbarosh and/or Stenton Leigh.

178.    Levie's valuation of XtraCard had no basis in reality.  Levie performed the XtraCard Valuation for the purpose of aiding Lauer's scheme to artificially inflate the Funds' NAV's and so that he, Levie, could earn substantial valuation fees.

### iv.       The Role of the Consultants

179.    Certain of the Consultants also played a role in the Nu-D-Zine scheme.

180.    For example, Cowen's wife, Braithwaite, was named the sole director of Nu-D-Zine.  By pouring money from the Funds into Nu-D-Zine, Lauer thereby funneled money through Nu-D-Zine to pay director fees to Cowen's wife.

181.    On December 29, 2000, Braithwaite, as Nu-D-Zine's sole director, approved the company's issuance of 2,500,000 shares to Capital Research.  As noted, Capital Research was owned by Cowen, Kelly, Garvey, and, through Alpha Omega, Lauer. Upon information and belief, Capital Research did not pay for this Nu-D-Zine stock.

182.    In addition, Isaacson and Thornhill received a finder's fee for introducing the Nu-D-Zine shell to Lauer and the Funds.

183.    In October of 2002, Isaacson was appointed president and director of Nu-D-Zine. Among other things, Isaacson was responsible for maintaining Nu-D-Zine's books and records.

184.    By pouring money into Nu-D-Zine, Lauer caused the Funds to effectively pay the officer and director fees of Isaacson.

185.    At the same time Isaacson served as director of Nu-D-Zine, Thornhill – Isaacson's investment banking company – served to broker the deal through which the Funds acquired a majority of the shares of Nu-D-Zine.

186.    Nu-D-Zine also paid Thornhill for consulting services rendered to SMX, another shell portfolio company discussed below.

b.      **SMX Corporation**

i.      **The role of the Officers and Directors**

187.    Another of the Lancer-Controlled Shells into which Lauer caused the Funds to pour money for the purpose of dramatically inflating the Funds' NAV's, and his own management and incentive fees, was SMX Corporation ("SMX").

188.    As of December 31, 2000, SMX had no operations, no revenues and total assets of only $2,154,244, made up of only cash and a note receivable. Like Nu-D-Zine, SMX was a non-reporting company. It did not file quarterly or annual reports with the SEC or other publicly available financial information, and was not traded on a national stock exchange such as the NYSE, NASDAQ or AMEX.

189.    As of December 31, 2000, Offshore held stock and warrants in SMX which Lauer valued at a total of $188,734,700 even though Offshore paid only $2,354,810.25 for these shares.

190.    As of December 31, 2000, Partners held stock and warrants in SMX which Lauer valued at a total of $19,959,750 even though Partners paid only $1,416,512.50 for these shares.

191.    As of December 31, 2000, Orbiter, held stock and warrants in SMX which Lauer valued at a total of $10,699,040 even though Orbiter paid only $159,634 for these shares.

192.    In addition, as of December 31, 2000, Viator held stock and warrants in SMX which Lauer valued at a total of $8,871,350 even though Viator paid only $268,287.50 for these shares.

193.    Thus, Lauer valued the Funds' holdings in SMX at $228,264,840, even though (a) the Funds paid only $4,199,244.25 for these holdings; and (b) SMX had no revenues, no operations and total assets of only $2,154,244 in 2000.

194.    In a June, 2001 valuation memo of SMX as of December 31, 2000, prepared by Cowen for Lauer, Lauer justified the outrageously inflated valuation of the Funds' holdings in SMX on the grounds that SMX "is involved in the marketing and sale of NASCAR licensed and owned products to the NASCAR sports enthusiast and collector which today is a multi-billion dollar market."

195.    Lauer's statements were false. SMX's only involvement in the NASCAR products industry was based on loans made to, and a proposed merger with, Raceway Net, Inc. and Raceway Marketing LLC. The proposed merger fell apart in March, 2001, three months before Lauer made these statements in the valuation memo.

196.    As of December 31, 2000, Offshore's holdings in SMX - at the absurdly high NAV stated by Lauer - represented over 27% of Offshore's total NAV, in direct contravention to the investment restriction in the Offshore PPM that Offshore would not concentrate more than 20% of its NAV in any one security.

197.    As of December 31, 2001, Offshore held stock and warrants in SMX which Lauer valued at a total of $133,416,942.75 even though Offshore paid only $4,243,388.25 total for these shares, 99.6% of which were restricted.

198.    As of December 31, 2001, Partners held stock and warrants in SMX which Lauer valued at a total of $24,492,818.50 even though Partners paid only $2,112,114.86 total for these shares.

199.    As of December 31, 2001, Orbiter held stock and warrants in SMX which Lauer valued at a total of $10,262,682.50 even though Orbiter paid only $172,634 total for these shares.

200.    As of December 31, 2001, Viator held stock and warrants in SMX which Lauer valued at a total of $4,848,550 even though Viator paid only $373,787.50 total for these shares.

201.    Thus, Lauer valued the Funds' holdings in SMX as of December 31, 2001 at $173,020,993.75, even though (a) the Funds paid only $6,901,924.61 for these holdings; and (b) SMX had revenues of only $99,441 and total assets of only $1,282,034 in 2001.

202.    In a June, 2002 valuation memo of SMX as of December 31, 2001, Lauer justified his valuation of the Funds' holdings in SMX. Lauer had Cowen write this memo based on the absurd valuation provided by the Appraisers. Lauer justified SMX's valuation by claiming that the company "has identified numerous potential acquisition candidates, one of which is Space Logic, Ltd.," supposedly a manufacturer of airport baggage handling security software. Unsurprisingly, the purported acquisition of Space Logic, Ltd. had not occurred as of the date of the valuation memo and, in fact, would never occur.

203.    Cowen, Lauer, and Garvey did not act alone in perpetrating the SMX scheme. They received the help of many of the Co-Defendants herein who, like Lauer and Garvey, benefited financially from the scheme.

### ii.    The Role of the Appraisers

204.    Lauer caused the Funds to retain Barbarosh and Stenton Leigh in early 2002 to perform bogus appraisals of SMX to justify the absurdly high values he ascribed to the Funds' holdings in SMX.

205.    In late 2000, Barbarosh, through his company EAI Partners, Inc. ("EAI"), owned 744,818 shares of SMX. At the time, Barbarosh was the sole officer and director of EAI.

206.    On October 29, 2000, EAI entered into an agreement with Offshore whereby, for a period of two (2) years commencing on October 29, 2000 and ending on October 29, 2002, neither Barbarosh nor any other agent of EAI could sell any of the 744,818 shares of SMX common stock owned either directly or indirectly by EAI.

207.    In addition, on June 8, 2001, through unanimous consent of the directors of SMX, 217,560 additional shares of the company's common stock were issued to SLBR, another company owned and operated by Barbarosh. These shares were issued for SLBR's actions related to SMX's lawsuit against Raceway and were given to SLBR free.

208.    Thus, as of May 23, 2002, Barbarosh, through EAI and SLBR, owned 962,378 shares of SMX common stock.

209.    In addition, Stenton Leigh and SMX shared the same address.

210.    Despite Barbarosh's significant financial interest in and relationship to SMX, on May 23, 2002, Barbarosh and Stenton Leigh prepared a valuation of the Funds' holdings in SMX as of December 31, 2001 (the "SMX Valuation").

211.    In preparing the SMX Valuation, Barbarosh and Stenton Leigh owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

212.    Barbarosh and Stenton Leigh breached these duties by significantly overstating the true value of SMX.

213.    As previously noted, as of the date of the valuation, SMX was a shell corporation, with limited operations, revenues of only $99,441, and little to no real assets. Yet, in the SMX Valuation, Barbarosh and Stenton Leigh state that Offshore's holdings in SMX were worth approximately $145,300,000.

214.    Barbarosh's and Stenton Leigh's appraisal of SMX had no basis in reality. Barbarosh and Stenton Leigh performed the SMX Valuation for the purpose of aiding Lauer's scheme to artificially inflate the NAV's of the Funds, so that Barbarosh and Stenton Leigh could earn substantial valuation fees.

215.   To the extent Barbarosh could sell the SMX stock he owned individually and through EAI, he stood to reap further financial rewards since Lauer artificially inflated the price of the publicly traded SMX stock.

### iii.   The Role of the Consultants

216.   Certain of the Consultants also played a role in the SMX scheme.

217.   For instance, as of December 31, 2000, Braithwaite was a director of SMX. By investing money into SMX, Lauer, on information and belief, caused the Funds to effectively pay the director fees of Braithwaite.

218.   In addition, at all relevant time periods, Isaacson was the president and a director of SMX. By pouring money into SMX, Lauer, on information and belief, caused the Funds to effectively pay the officer and director fees of Isaacson.

219.   Furthermore, even though Isaacson was the president and director of SMX, Isaacson, through Thornhill, accepted consulting fees for "finding" the Funds as an SMX investor. As president and director of SMX, Isaacson would have had a duty to raise capital for SMX regardless and should not have been separately compensated for it.

220.   In addition, although the consulting fees were theoretically paid by SMX, as a practical matter, the Funds paid the consulting fees with the money it invested into SMX.

c.     **AUG/Biometrics**

i.     **The Role of the Officers and Directors**

221.   Another Lancer-Controlled Shell into which Lauer caused the Funds to pour money in order to dramatically inflate the Funds' NAV's, and his own management and incentive fees, was AUG Corp. ("AUG").

222.   On or about August 31, 2001, AUG and Offshore entered into an Agreement and Plan of Reorganization (the "AUG Plan"). Under the AUG Plan, Lauer caused the Funds to pay $400,000 to purchase what would end up being over 90% of AUG's outstanding shares after the transaction was completed.

223.   As a part of the scheme with AUG, Capital Research received 670,854 shares of restricted common stock This was a private transaction and Capital Research did not pay for these shares. Rather, the shares were given to Capital Research by, among others, EAI Partners, Inc. – a company in which Barbarosh had an ownership interest. As noted, Lauer owned 25% of Capital Research through Alpha Omega, as did Garvey, Cowen and Kelly.

224.   On October 20, 2001, AUG issued warrants to Lauer's "investment vehicle," Alpha Omega. Lauer later caused the Funds to buy these warrants from Alpha Omega.

225.   As of December 31, 2001, Lauer had apportioned the Funds' ownership of AUG shares as follows. Offshore owned 61,600,000 shares of restricted common stock of AUG, of which 18,000,000 shares were counted toward Offshore's NAV as a way to appease Offshore's auditor and fund administrator for valuation purposes. Partners owned 12,500,000 shares of AUG restricted common stock, Viator owned 1,400,000 shares of AUG restricted common stock, and Orbiter owned 2,000,000 shares of AUG restricted common stock.

226.   On December 31, 2001, Lauer caused Offshore to purchase 1,500 shares of

- 41 -

common stock in AUG on the open market for $3.50 per share, even though Offshore already owned tens of millions of shares of AUG. There is no reasonable business explanation for why Lauer would cause Offshore to purchase such a small number of AUG shares on that day, other than to further his NAV inflation scheme.

227.   The total number of shares of AUG common stock traded on December 31, 2001, was 1,800, or just 300 more than purchased by Offshore. This means that Offshore's purchases significantly if not completely determined the closing price of AUG as of December 31, 2001.

228.   Based on the December 31, 2001 trade by Offshore, Lauer valued all of the shares of AUG owned by the Funds at $3.40 per share for a total of over $115,000,000, even though the shares were restricted and even though the stock was thinly traded.

229.   Lauer valued the Funds' shares of AUG at over $115,000,000 even though (a) the Funds invested only $1,200,000 for these shares during the prior three months; (b) AUG had no operating revenues in 2001, a negative cash flow from operations of $385,593, and an accumulated deficit[16] from operations of $22,371,214; and (c) in their 2001 audit report, AUG's auditors expressed significant doubt about AUG's ability to continue as a going concern.

230.   Lauer continued to pour money from the Funds into AUG in 2002 in return for millions more restricted shares, while continuing to manipulate AUG's freely trading share price – even causing Partners to buy shares from Offshore in the open market and, in the process, incurring broker fees for such trades unnecessarily.

231.   As of December 31, 2002, Lauer valued the Funds' holdings in AUG at $247,000,000, even though: (a) the Funds invested a total of only $6,138,329 to acquire these

---

[16] An accumulated deficit from operations is the sum of all annual deficits accumulated to the accounting date and measures the future revenue required to pay for past transactions. Thus, negative cash flow would add to the accumulated deficit.

shares; (b) as of September 30, 2002, AUG, which merged with Biometrics Security Technology, Inc. ("Biometrics") during 2002, reported total revenues for the first nine months of 2002 of just $68,936, and showed a net loss for the year of $24,831,555; and (c) in their 2002 audit report, AUG's auditors expressed significant doubt about AUG's ability to continue as a going concern.

232.   Lauer did not act alone in perpetrating the AUG scheme.  He received the help of many of the Co-defendants herein who, like Lauer, benefited financially from the scheme.

### ii.   The Role of the Market Makers

233.   Shamrock helped Lauer manipulate the per share price of AUG to help Lauer justify a dramatically overstated value for all of the Funds' shares in AUG.

234.   On or about March 28, 2002, for example, Huard, an employee of Shamrock, purchased 500 shares of common stock of AUG at a price of $5.25 per share.

235.   On March 31, 2002, Lauer valued all of the Funds' shares of common stock in AUG, including the 39,908.955 shares of restricted common stock, at $5.25 per share, based on the March 28, 2002 Huard trade, even though just nine days earlier Offshore purchased 6,000,000 shares of restricted common stock of AUG for only $.05 per share.

236.   As noted, Huard admitted at his February 7, 2005 deposition that while working at Shamrock, he would purchase stock at the end of a quarter for the purpose of assisting Lauer in pumping up the NAV's of the Funds.

237.   In addition, as noted above, Capital Research received 670,854 shares of restricted common stock of AUG for no consideration.  Kelly, the sole owner of Shamrock, owned 25% of Capital Research.  Therefore, Lauer included Kelly as a beneficiary of the AUG scheme, presumably in exchange for Kelly's role in the scheme.

### iii.    The Role of the Appraisers

238.    Lauer caused the Funds to retain Barbarosh and Stenton Leigh in early 2002 to perform bogus appraisals of AUG to justify the absurdly high values he ascribed to the Funds' holdings in AUG.

239.    In 2001, Barbarosh, through EAI, owned 24,207,036 shares of AUG.

240.    On August 31, 2001, Offshore and AUG entered into an agreement by which Offshore purchased all of EAI's shares of AUG.

241.    In October, 2001, AUG gave a total of two million shares in the company apportioned among three entities: Sterling, a company owned by Cowen; Isaacson and his wife Lori; and Andora Investments, L.P., an entity in which Barbarosh was a partner. These shares were issued to Sterling, to Isaacson and his wife, and to Andora Investments without any of those three entities paying any money to AUG to receive the shares.

242.    Despite Barbarosh's financial interest in AUG, on May 3, 2002, he and Stenton Leigh prepared a valuation report of the Funds' holdings in AUG as of December 31, 2001 (the "AUG Valuation").

243.    In preparing the AUG Valuation, Barbarosh and Stenton Leigh owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

244.    Barbarosh and Stenton Leigh breached these duties by, among other things, significantly overstating the true value of the AUG.

245.    As noted, as of the date of the valuation, AUG was essentially a shell corporation, with little to no revenues, little to no operations, and assets of only $636,079.  Yet, in the AUG

Valuation, Barbarosh and Stenton Leigh state that AUG had a value of $3.40 per share, meaning that the value of all of the Funds' shares in AUG totaled $279,445,878.

246.     Barbarosh and Stenton Leigh also did not disclose in the AUG Valuation that Barbarosh was a previous director of AUG.

247.     Barbarosh's and Stenton Leigh's appraisal had no basis in reality, and was performed for the sole purpose of aiding Lauer's scheme to artificially inflate the NAV's of the Funds, and so that Barbarosh and Stenton Leigh could earn substantial fees.

248.     Furthermore, by participating in Lauer's scheme, Barbarosh could help insure that the Funds would continue to invest in AUG, which would perpetuate the existence of the shell corporation, and enable him to continue to draw director fees.

249.     Furthermore, to the extent Barbarosh, through Andora, could sell the stock of AUG that Lauer effectively gave to him, Barbarosh could reap further financial rewards, particularly since Lauer artificially inflated the price of the publicly traded stock.

250.     In early 2003, Lauer caused the Funds to retain Levie to prepare bogus appraisals of AUG and of Biometrics after the 2002 merger of AUG into Biometrics.

251.     In particular, Levie an April 25, 2003, Valuation Opinion Report of the Funds' holdings in AUG/Biometrics as of December 31, 2002 (the "Biometrics Valuation").

252.     In preparing the Biometrics Valuation, Levie owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

253.     Levie breached these duties by, among other things, significantly overstating the true value of AUG/Biometrics.

254.    Further, Levie failed to conduct an independent investigation of AUG/Biometrics. Instead, Levie used Barbarosh's and Stenton Leigh's assessments of the financial condition of AUG/Biometrics without sufficient independent verification, and even though he knew of Barbarosh's conflicts of interest.

255.    As noted, as of the date of the Biometrics Valuation, AUG/Biometrics had incurred net losses for the company's fiscal year ending December 31, 2002 of $24,831,555, its liabilities exceeded its assets by $1,557,036, and the company's auditors expressed a substantial doubt that AUG/Biometrics could continue as a going concern. Yet in the AUG/Biometrics Valuations, Levie stated that the Funds' holdings in AUG and Biometrics respectively had a value of $124,198,350 as of December 31, 2002. In fact, in an SEC filing that Isaacson caused AUG/Biometrics to file in May of 2003, AUG/Biometrics noted that the company had suspended operations entirely in May of 2003.

256.    Levie's appraisals had no basis in reality. He performed the appraisals for the purpose of aiding Lauer in his scheme to artificially inflate the NAV's of the Funds, and so that he, Levie, could earn substantial fees for performing the work.

### iv.    The Role of the Consultants

257.    Certain of the Consultants also played a part in the AUG scheme.

258.    As a part of the AUG Plan's closing, the Funds paid $400,000 to various persons and entities to facilitate the transaction. The largest sum of money paid to anyone through the AUG Plan's closing was $150,000 to Thornhill for "services" rendered.

259.    Once the AUG Plan was implemented, Lauer directed AUG to name Isaacson as its president and a director. In return, Isaacson received $2,000 per month in director's fees that

AUG paid to Thornhill. Braithwaite similarly was appointed as an AUG director and received her $2,000 per month.

260.   At the same time that Isaacson served as president and director of AUG, Thornhill had an investment banking agreement with AUG. This investment banking agreement required AUG to pay Thornhill 10% of all money Thornhill "raised" for AUG. Over and above the 10% fee, AUG also paid an additional 3% of all money raised to Thornhill for "expenses." Thus, because of this investment banking agreement, any time that the Funds provided any money to AUG, Thornhill received 13% of that money in cash.

261.   For example, on November 12, 2001, when AUG issued 27,500,000 shares of restricted common stock to Offshore in exchange for $700,000, Thornhill received an "investment banking" fee of $80,000 for handling the sale, and an additional $11,000 for Thornhill's "expenses."

262.   Thornhill continued to collect hundreds of thousands of dollars in investment banking fees, director's fees, and payments for unspecified expenses. Whenever the Funds provided money to AUG, Thornhill took its cut first.

263.   In total, Thornhill received "investment banking" fees of over $1,000,000 as a result of the private placement transactions between AUG and the Funds. Most, if not all, of the money AUG used to pay Thornhill came from money that the Funds poured into AUG.

264.   As the president and a director of AUG, Isaacson already had a duty to try and raise capital for AUG, and should not have been compensated for raising money from the Funds. Isaacson had a conflict of interest in accepting "investment banking" fees for raising money for a company in which he served as president and director.

### d.   **Fidelity First**

### i.      The Role of the Officers and Directors

265.    Another Lancer-Controlled Shell into which Lauer caused the Funds to pour money in order to dramatically inflate the Funds' NAV's, and his own management and incentive fees, was Fidelity First Financial Corp. ("Fidelity First").

266.    As of December 31, 2000, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $39,510,715.50 even though Offshore paid only $8,200,355.90 for these shares.

267.    As of December 31, 2000, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $21,972,685.50 even though Partners paid only $3,316,890.97 for these shares.

268.    As of December 31, 2000, Orbiter held stock and warrants in Fidelity First which Lauer valued at a total of $8,057,236.32 even though Orbiter paid only $976,370.61 for these shares.

269.    As of December 31, 2000, Viator held stock and warrants in Fidelity First which Lauer valued at a total of $1,462,054 even though Viator paid only $128,902 for these shares.

270.    Thus, as of December 31, 2000, Lauer valued the Funds' holdings in Fidelity First at $71,002,691.32, even though (a) the Funds only paid $12,622,519.48 for these shares; and (b) Fidelity First had discontinued operations, revenues of only $810,696 for the year (all of which were generated prior to disposing of its mortgage banking operation), and a negative net worth of $753,520.

271.    During 2001, Fidelity First defaulted on promissory notes in favor of the Funds totaling $500,000, on which interest totaling $66,566.29 had accrued.   The loans were convertible into common stock. Fidelity First could not pay any of this money back, so Offshore

agreed to convert these loans into shares at the rate of 1 share for every 1 cent of interest and principal. The Funds thus received 56,656,629 additional shares in Fidelity First in exchange for the forgiveness of the $566,566.29 that Fidelity First could not repay.

272.     Even though Fidelity First could not repay the $566,566.29 it owed the Funds, Lauer valued the shares he caused the Funds to obtain through the conversion at $2 per share. Thus, the conversion allowed Lauer to magically transform approximately $566,566.29 in worthless debt – which should have been valued at close to nothing –  into an equity position with a purported value of approximately $113,000,000.

273.     Also during 2001, the Funds made loans to Fidelity First for which the Funds paid "consulting fees" to Capital Research.  As noted, Lauer, through Alpha Omega, owned 25% of Capital Research, as did Garvey, Cowen and Kelly.  For instance:

(a)     On September 17, 2001, Capital Research received a $5,000 consulting fee for obtaining a $50,000 loan from one of the Funds to Fidelity First;

(b)     On October 29, 2001, Capital Research received a $5,000 consulting fee for obtaining a $40,000 loan from one of the Funds to Fidelity First; and

(c)     On December 6, 2001, Capital Research received a $5,000 consulting fee for obtaining a $35,000 loan from one of the Funds to Fidelity First.

274.     As of December 31, 2001, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $120,192,474, even though Offshore paid only $9,573,825.90 total for these shares.

275.     As of December 31, 2001, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $35,233,810.50 even though Partners paid only $3,555,880.97 total for these shares.

276.    As of December 31, 2001, Orbiter held stock and warrants in Fidelity First which Lauer valued at a total of $6,569.904 even though Orbiter paid only $976,370.61 total for these shares.

277.    As of December 31, 2001, Viator held stock and warrants in Fidelity First which Lauer valued at a total of $1,889,971 even though Viator paid only $128,902 total for these shares.

278.    Thus, as of December 31, 2001, Lauer valued the Funds' holdings in Fidelity First at $163,886,160, even though (a) the Funds only paid $14,234,979 for these shares; and (b) Fidelity First had discontinued operations, prior revenues of only $106,768 for the year, assets of only $81,646, and a negative net worth of $424,669.

279.    In a June, 2002 memorandum to two of the Funds' service providers – Citco and PricewaterhouseCoopers N.A. ("PwC") – relating to fiscal year 2001, Lauer justified his valuation of the Funds' holdings in Fidelity First on the grounds that the company "has developed an acquisition strategy to build a new type of financial services company. The concept is based upon the acquisition of Columbia National and or Vcross . . .." Citco and PwC accepted this memo as sufficient for valuation purposes despite the memo's blatant speculation regarding Fidelity First's future.

280.    Not surprisingly, the purported acquisitions never occurred.

281.    As of December 31, 2002, Offshore held stock and warrants in Fidelity First which Lauer valued at a total of $181,489,346 even though Offshore paid only $10,531,830.73 for these shares.

282. As of December 31, 2002, Partners held stock and warrants in Fidelity First which Lauer valued at a total of $51,462,405.01 even though Partners paid only $3,487,247.22 for these shares.

283. As of December 31, 2002, Omnifund held stock and warrants in Fidelity First which Lauer valued at a total of $11,398,325 even though Omnifund paid only $1,099,803.68 for these shares.

284. Thus, as of December 31, 2002, Lauer valued the Funds' holdings in Fidelity First at $244,350,076, even though (a) the Funds only paid $15,118,882 for these shares; and (b) Fidelity First had no real operations, no revenues, and little to no assets.

### ii.   **The Role of the Appraisers**

285. In early 2003, Lauer caused the Funds to retain Barbarosh and Stenton Leigh to perform bogus appraisals of Fidelity First to justify the absurdly high values he ascribed to the Funds' holdings in Fidelity First.

286. On June 10, 2003, Barbarosh and Stenton Leigh prepared a valuation of Fidelity First as of the period ending December 31, 2002 (the "Fidelity First Valuation").

287. In preparing the Fidelity First Valuation, Barbarosh and Stenton Leigh owed the Funds duties of general and professional care, including those standards of care articulated in the USPAP and NACVA guidelines.

288. Barbarosh and Stenton Leigh breached these duties by, among other things, significantly overstating the true value of Fidelity First .

289. As of the effective date of the Fidelity First Valuation, Fidelity First was a shell company with no operations, no revenues and significant debt.   Yet, in the Fidelity First Valuation, Barbarosh and Stenton Leigh state that the Funds' holdings in Fidelity First was

$114,633,978, based entirely on alleged acquisitions of Community First Financial ("CFF") and First Guaranty Mortgage ("FGM").

290.    Any reasonable investigation by Barbarosh and Stenton Leigh would have revealed that Fidelity First was not going to merge with CFF or FGM, and that even if it did, the value of the Funds' holdings in Fidelity First would have been nowhere near the reported value of $114,633,978.

### iii.    The Role of the Consultants

291.    As of December 31, 2000, Maum was the president and chief executive officer of Fidelity First and Raker was the executive vice president and chief financial officer.

292.    Between 2000 and 2003, the Funds poured more than $1,000,000.00 into Fidelity First in exchange for a series of promissory notes in varying amounts.  Fidelity First had no real operations during this period and, upon information and belief, all or a grossly disproportionate share of these funds went directly to Raker and Maum, as compensation for the aid and assistance they provided to Lauer's scheme.

293.    Lauer hired Maum to take Bruce Cowen's job as the senior analyst for the Funds, following Cowen's indictment in August of 2002.  In fact, on or about December 18, 2002, Raker became the Funds' chief financial officer.

294.    Although the Funds' hiring of Raker and Maum was announced with great fanfare to investors of the Funds, Lauer, Maum, and Raker concealed from those investors that Raker and Maum were principals of Fidelity First, one of the Lancer-Controlled Shells.

295.    Between 2001 and 2003, the Funds also paid Raker and Maum $30,000 in monthly "consulting" fees, for their help in finding shell companies like Fidelity First for the Funds. To conceal obvious conflicts of interest between Raker, Maum, Lauer, and Fidelity First,

Lauer caused these "consulting" fees to be paid to Raker and Maum through two separate entities: The Redwood Group ("Redwood") and Greyhawke Capital Advisors ("Greyhawke").

296.    In addition to the money Raker and Maum took from loans the Funds made to Fidelity First, Raker and Maum received at least another $287,400 from the Funds in combined monthly consulting fees, paid through Redwood and Greyhawke.

297.    Thus, contrary to the PPM, and without the knowledge of investors of the Funds, Raker and Maum simultaneously served and were separately compensated for serving as: (i) officers/employees of Lancer; (ii) principals of Fidelity First; and (iii) "independent" consultants to the Funds.

298.    Raker and Maum also played a role in the sham valuation of Fidelity First prepared by Barbarosh and Stenton Leigh.  On February 28, 2003, Raker sent a memo to Lauer and Maum, (the "Feb. 28th Raker Memo"), which provides:

> Date:   February 28, 2003
>
> To:     Michael Lauer
> CC:     Bob Maum
>
> Re:     Fidelity First Financial
>
> I wanted to let you know that I spoke with Marty Weisbaum of Stenton Leigh Group.  He has requested that Fidelity provide the following information to "assist" in their valuation efforts.[17]
>
> - Current business plan
> - Current financial information
> - Proformas surrounding the business plan
> - Anticipated capital expenditures
> - Competitors for Fidelity in executing the business plan
> - Current balance sheets and profit and loss statements
> - Audited financial statements

---

[17] The quotations marks around "assist" are in the original Feb. 28th Raker Memo.

- Last four years of financial history
- Net Operating losses.

I indicated to Marty that it would take some time for Fidelity to provide the above and that I would contact him next week to provide a better timetable.

299.   Raker used quotations on either side of the word "assist" in the Feb. 28th Raker Memo to reflect his intent to help Barbarosh and Stenton Leigh support the bogus Fidelity First Valuation.

300.   Raker, Maum, and Lauer did in fact "assist" Stenton Leigh and Barbarosh with a sham valuation of Fidelity First by providing bogus information to Stenton Leigh and Barbarosh.

301.   Among other things, Lauer, Raker, and Maum falsely informed Stenton Leigh that Fidelity First was poised to acquire two mortgage companies: Community First Financial ("CFF") and First Guaranty Mortgage ("FGM"), and that Fidelity First had received letters of intent from CFF and FGM agreeing to this acquisition.

302.   Raker, Maum, and Lauer knew as of the date of the Fidelity First Valuation that negotiations for Fidelity First to acquire CFF and FGM were dead or at an impasse, and that it was extremely unlikely as of that date that either of those acquisitions would occur.

303.   Raker, Maum, and Lauer also knew that representations in the Fidelity First Valuation that Fidelity First had received actual letters of intent from CFF and FGM to complete those acquisitions were false.

304.   Raker, Maum, and Lauer nevertheless allowed Barbarosh and Stenton Leigh to incorporate this information into the $114,633,978 Fidelity First Valuation, even though Raker, Maum, and Lauer knew or should have known that it was false.

f.      **Other Miscellaneous Examples of Self-Dealing**

305.    Other blatant examples of Lauer's breach of his duties, with the assistance of the Co-defendants, include the following:

### i.    EPL

306.    EPL Technologies ("EPL") was another entity in which the Funds invested.

307.    On December 1, 1999, Viator agreed to loan $500,000 to EPL. Capital Research received $40,000 as a "closing fee" for the transaction.   Also on December 1, 1999, Offshore agreed to loan EPL $3,000,000.   Capital Research received $240,000 plus a warrant for 350,000 common shares of EPL as a "closing fee" for the second transaction.   The trend of Capital Research getting "consulting fees" for the same "services" Lauer was supposed to provide to the Funds continued over the next several years, with Capital Research obtaining hundreds of thousands of shares and considerable cash for no consideration, relating to modifications of the loans.

### ii.    Equitel

308.    Equitel, Inc. f/k/a Wolfpack f/k/a TeleData World Services ("Equitel") was another entity in which the Funds invested.

309.    On February 8, 2000, the Funds agreed to loan $1,000,000 to Equitel in return for a 34% equity interest in Equitel.   As part of this transaction, Capital Research received a cash fee of $70,000 plus a 2.5% interest in Equitel common stock.

### iii.    China Broadband

310.    China Broadband Corp. ("China Broadband") was another entity in which the Funds invested.

311.   On May 12, 2000, the Funds purchased 1,301,667 shares from China Broadband at $7.50 per share.  On that same day, China Broadband sold 1,530,000 shares to Lauer, Garvey, and Hauser at $1.00 per share – $6.50 per share less than the Funds paid.

### iv.   Lighthouse Fast Ferries

312.   Lighthouse Fast Ferry ("LHFF") was another company in which the Funds invested.

313.   By December 31, 2000, the Funds held several million shares of LHFF.

314.   During 2000 and 2001, Kelly accumulated approximately 175,000 shares of LHFF shares for himself.

315.   Kelly did not purchase the vast majority of his LHFF shares on the open market. Instead, LHFF transferred shares to him in exchange for personal loans he made to LHFF, as well as loan extensions he gave to LHFF. These loans were separate from loans that the Funds made to LHFF.

316.   At Lauer's request, Kelly directed securities dealers at Shamrock to push up the closing price of LHFF stock at the end of various months by executing buy orders for LHFF stock at artificially high prices.

317.   Shamrock's end-of-month purchases of LHFF stock significantly and artificially inflated the share price of LHFF stock.

318.   In turn, Lauer valued all of the Funds' holdings in LHFF at the artificially high price, causing an artificial spike in the Funds' NAV's, and a corresponding artificial spike in the management and incentive fees payable to Lauer, Garvey and Hauser.

### 3.   Carens' Role in the Scheme

319.   Carens is the mother of three of Lauer's five children.  At all times prior to 2005, she was Lauer's girlfriend, and in or around 2005, she married Lauer.

320.   Carens aided and abetted Lauer's fiduciary breaches by assisting Lauer in hiding and secreting away the fruits of Lauer's fiduciary breaches and the assets of the Funds in general. She often placed valuable assets in her name or a fictitious name in an effort to prevent investors and/or the SEC from seizing these assets.

321.   During this same period of time, and even though she was not an employee, officer, or director of any of the Lancer Funds, Carens actively solicited Fund investors and aided and abetted Lauer's and Cowen's solicitation of Fund investors.

### a.   Carens Helped Lauer Violate the Asset Freeze

322.   On July 10, 2003, the Court in the Enforcement Action entered an Order freezing Lauer's personal assets (the "Asset Freeze Order").

323.   After entry of the Asset Freeze Order, the SEC and the Receiver learned that Lauer had intentionally diverted assets of the Receivership Entities, Partners, and his personal assets to Carens in an effort to shield them from the SEC and the Receiver, and in flagrant violation of the Asset Freeze Order.

324.   In fact, the Court has already found that Lauer diverted $21,500 from the sale of a Mini-Cooper; $11,500 from the sale of BMW motorcycle; and $139,258 recouped from surrendering a $412,467 life insurance policy the sale proceeds into an account in the name of "The Lava Group," which is a "d/b/a" of Carens.  *See* Order Affirming in Part Magistrate Judge's Report and Recommendation entered on January 24, 2006.

### b.   Carens Aids Lauer in Airplane Scandal

325.    In addition, the Receiver discovered that Alpha Omega owned a 2000 Cessna, FAA registration number N278ME ("Cessna"), held in storage by Panorama Flight Service, Inc. ("Panorama").

326.    The Receiver procured a title certificate indicating that Alpha Omega was the registered owner of the Cessna, and began to market it for sale for the benefit of the Receivership Entities' creditors.

327.    On February 25, 2004, the Receiver filed in the Enforcement Action a Motion for Authority to Sell the Cessna Free and Clear of All Liens, Claims and Encumbrances (the "Cessna Sale Motion").

328.    Neither Lauer nor Carens objected to the Cessna Sale Motion.

329.    On March 22, 2004, the Court entered an Order granting the Cessna Sale Motion and authorizing the Receiver to sell the Cessna (the "Sale Order").

330.    Subsequent to entry of the Sale Order, the purchaser of the Cessna performed a title search and discovered a purported transfer of the Cessna from Alpha Omega to Carens, as evidenced by a May 21, 2003 letter from the Federal Aviation Administration ("FAA") to Lauer rejecting an Application for Registration of the Cessna in Carens' name (the "May 21st FAA Letter").

331.    Carens did not provide Alpha Omega with any consideration in exchange for the purported transfer of the Cessna. In fact, Lauer, through Alpha Omega, attempted to transfer the Cessna to Carens without consideration in the midst of his preparations for an onslaught of lawsuits from angry investors, and for the then-pending bankruptcy of Partners.

332.   On August 18, 2004, to facilitate the sale of the Cessna pursuant to the Sale Order, the Receiver filed an Emergency Motion to Deem Purported Transfer of Cessna Null and Void (the "Emergency Motion").

333.   The Court ultimately held that the purported transfer of the Cessna from Alpha Omega to Carens was "an attempt to further divert assets out of the hands of the Lancer Entities and will not be condoned by this Court."

### c.   Carens Secretes Away the Funds' Assets

334.   Carens holds a brokerage account at Morgan Keegan.  The account includes one sizeable holding -- Endeavor Corporation, formerly known as Continental Southern Resources ("Endeavor").  Carens purchased the shares in Endeavour with a $250,000 gift she received from Lauer in 2002.

335.   Carens also charged thousands of dollars in personal expenses to Alpha Omega, an entity whose funds derived from assets that Lauer wrongfully diverted from the Funds. Carens routinely charged lingerie and other clothing items, groceries, and pet care expenses to Alpha Omega's American Express account.  In fact, Carens had an Alpha Omega American Express card in her own name even though she was not an owner, employee, officer, or director of Alpha Omega.

336.   Carens knew or should have known under the circumstances that monies and other assets she received from Lauer were wrongfully diverted from the Funds, and that Lauer was transferring those assets to her in an improper effort to shield them from the SEC, the Receiver, and/or the investors and creditors of the Funds.

### D.   THE FIFTH AMENDMENT PRIVILEGE

337.    The SEC deposed a number of the Co-defendants in connection with the Enforcement Action, including Garvey, Hauser, Newman, Barbarosh, Levie, and Carens.   The common thread throughout these depositions was the response of the Co-defendants to questions regarding their role with Lauer and the Funds: the Fifth Amendment privilege against self-incrimination.

338.    The Co-defendants took the Fifth because they knew they did something wrong, and they were afraid that honestly responding to the SEC's questions could implicate them in Lauer's scheme.

### 1.    Garvey Asserts His Fifth Amendment Privilege

339.    The SEC deposed Garvey in the Enforcement Action on July 19, 2004.   Garvey invoked his Fifth Amendment privilege against self-incrimination in response to all meaningful questions relating to his role with the Funds.  For instances:

(i)    When the SEC asked Garvey if he was involved in procuring valuations for portfolio companies of the Funds, Garvey took the Fifth.

(ii)    When the SEC asked Garvey if he had an opinion as to whether the subject valuations were reasonable, Garvey took the Fifth.

(iii)    When the SEC asked Garvey if he was involved in procuring or attempting to procure audit opinions on behalf of the Funds, Garvey took the Fifth.

(iv)    When the SEC asked Garvey about the extent of his involvement in assigning values to any of the shares held by the Funds, Garvey took the Fifth.

(v)    When the SEC asked Garvey whether he was ever instructed by Lauer to overstate the value of any of the shares held by the Funds, Garvey took the Fifth.

(vi)     When the SEC asked Garvey whether Lauer instructed him to overstate the value of any shares, warrants, or bridge loans held by the Funds, Garvey took the Fifth.

(vii)    When the SEC asked Garvey whether Lauer instructed him to employ strategies to prominently or deceptively overstate the value of the Funds, Garvey took the Fifth.

## 2.     Hauser Asserts His Fifth Amendment Privilege

340.    The SEC deposed Hauser in the Enforcement Action on May 19, 2004. Hauser invoked his Fifth Amendment privilege against self-incrimination in response to all meaningful questions relating to his role with the Funds.

341.    As noted, Hauser was the Funds' Senior Trader.  Yet, when the SEC asked Hauser about the trading he performed for the Funds, Hauser took the Fifth.

342.    When the SEC asked Hauser to simply describe his position with the Funds, Hauser took the Fifth.

## 3.     Newman Asserts His Fifth Amendment Privilege

343.    The SEC deposed Newman in the Enforcement Action on July 27, 2004. Newman invoked his Fifth Amendment privilege against self-incrimination in response to all meaningful questions relating to his role with the Funds.

344.    When the SEC asked Newman if he ever had any dealings with any of the Funds' portfolio companies, Newman took the Fifth.

345.    When the SEC asked Newman if he ever had any dealings with the Funds' investors, Newman took the Fifth.

## 4.     Barbarosh Asserts His Fifth Amendment Privilege

346.    The SEC deposed Barbarosh in the Enforcement Action on May 6, 2004. Barbarosh invoked his Fifth Amendment privilege against self-incrimination in response to substantially all meaningful questions relating to his role with the Funds.

347.    When the SEC asked Barbarosh if he had any knowledge regarding the SMX valuations, Barbarosh too the Fifth.

348.    In fact, Barbarosh took the Fifth in response to every question regarding his valuation of SMX and any profits he and/or Stenton Leigh derived therefrom.

349.    Likewise, when the SEC asked Barbarosh if he had any knowledge regarding the Nu-D-Zine valuations, Barbarosh took the Fifth.

350.    In fact, Barbarosh took the Fifth in response to every meaningful question regarding Nu-D-Zine.

### 5.    Levie Asserts His Fifth Amendment Privilege

351.    The SEC deposed Levie in the Enforcement Action on April 26, 2004. Levie invoked his Fifth Amendment privilege against self-incrimination in response to all meaningful questions relating to his role with the Funds.

352.    When the SEC asked Levie whether he had any knowledge regarding the valuations he prepared for AUG/Biometrics, Levie took the Fifth.

353.    In fact, Levie invoked his Fifth Amendment privilege in response every question pertaining to his valuations of AUG/Biometrics, and any fees he derived therefrom.

354.    Levie also took the Fifth in response to every question regarding Nu-D-Zine and XtraCard.

### 6.    Carens Asserts Her Fifth Amendment Privilege

355.    The SEC deposed Carens in the Enforcement Action on December 13, 2004.

356.    During her deposition, Carens repeatedly invoked her Fifth Amendment privilege against self-incrimination.  For example:

(i)    Carens took the Fifth, or claimed that she "could not remember," in response to every meaningful question about her financial connection to Lauer.

(ii)    Carens took the Fifth when asked whether Lauer had transferred money to an account in the name of The Lava Group, or the source of any income for the Lauer group.

(iii)    Carens took the Fifth when asked when she first became aware of the Asset Freeze Order.

(iv)    Carens took the Fifth when asked if she had declared the $250,000 "gift" from Lauer described above on her federal income tax returns.

## IV.

## DAMAGES CAUSED BY DEFENDANTS' ACTIONS

357.    As the direct and proximate result of the Defendants' negligence, waste, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, professional malpractice, and other actions, the Funds have been damaged in a number of different ways.

358.    First, the Funds were depleted by paying extraordinary amounts in management, incentive and other "professional" fees to the Defendants.  The management and incentive fees paid to Lauer, Garvey and Hauser were calculated using the NAV's that the Defendants herein caused to be inflated and erroneously stated.  The "professional" fees paid to Barbarosh, Levie, Stenton Leigh, Braithwaite, Sterling, Kelly, Huard, Shamrock, Capital Research, Isaacson, LII, Thornhill, Maum and Raker were based on bogus services provided to the Funds designed to aid and abet Lauer's scheme.

359.    Second, the Funds were depleted by having their value poured into continuing "investments" in various portfolio companies even though the value of these companies was grossly inflated and none of them had significant earnings.

360.    Third, the Funds were depleted by redemptions calculated and paid to investors based on the inflated and erroneous NAV's.  The values ascribed to the redeemed shares were based on the inflated and erroneous NAV's.  But for the acts of the Defendants, these NAV's would have been substantially lower and, correspondingly, the depletions of the Funds' value through redemptions would have been much less.

361.    Fourth, the Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Funds were unable to repay.

## COUNT I

### (Negligence and Waste -- Lauer, Garvey, Hauser, and Raker)

362.    The Receiver incorporates the allegations contained in paragraphs 1 through 361 as if fully stated herein.

363.    At all relevant times, Lauer, Garvey, Hauser, and Raker owed fiduciary and other duties to the Funds to use reasonable care in handling the business affairs and assets of the Funds, including but not limited to, hundreds of millions of dollars in investments they made on behalf of the Funds' investors.

364.    These duties also included an obligation to implement certain investment safeguards, as promised the investors, to ensure that their investments were protected and not otherwise wasted.

365.    Lauer, Garvey, Hauser, and Raker breached these duties by negligently wasting and squandering millions of dollars of investor funds.

- 64 -

366.    A significant portion of the funds Lauer, Garvey, Hauser, and **Raker** did not squander or take as excessive management fees and commissions were invested in direct contravention of promises made to investors.

367.    Lauer, Garvey, Hauser, and Raker also caused the Funds to transfer vast sums of the investor money to persons and entities who were not entitled to those assets.

368.    Lauer, Garvey, Hauser, and Raker also caused the Funds to invest heavily in companies that were worthless and had no realistic prospect for growth, further damaging the value of the Funds.

369.    Lauer's, Garvey's, Hauser's and Raker's actions proximately caused the Funds to suffer substantial damages, including:

(a)    The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)    The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by various of the Defendants herein;

(c)    The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)    The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)    The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays that a judgment be entered against Lauer, Garvey, Hauser and Raker for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and (c) for such other relief as the Court deems just and proper.

## COUNT II

### (Breach of Fiduciary Duty Against Lauer, Garvey, Hauser, and Raker)

370. The Receiver incorporates the allegations contained in paragraphs 1 through 369 as if fully stated herein.

371. As officers, directors, and/or controlling persons of the Funds, Lauer, Garvey, Hauser, and Raker each owed Fiduciary Duties to the Funds, including:

    (a)    a duty to invest in securities for the Funds in accordance with the Funds' stated investment goals;

    (b)    a duty to fairly value the securities of the Funds;

    (c)    a duty not to act in their own interests to the detriment of the Funds;

    (d)    a duty not to usurp business opportunities of the Funds; and

    (e)    a general duty of care to act prudently and in the best interests of the Funds.

372. Lauer, Garvey, Hauser, and Raker breached the Fiduciary Duties owed to the Funds by, among other things:

    (a)    failing to invest in securities for the Funds in accordance with the Funds' stated investment goals;

    (b)    failing to fairly value the securities of the Funds;

    (c)    acting in their own interests to the detriment of the Funds;

(d)     usurping business opportunities of the Funds; and

(e)     failing to act prudently and in the best interests of the Funds.

373.    More specifically, Lauer, Garvey, Hauser, and Raker breached the Fiduciary Duties owed to the Funds by, among other things:

(a)     engaging in manipulative trading practices to create artificially high NAVs for the Funds;

(b)     causing the Funds to purchase shell corporations with little or no ongoing business;

(c)     valuing, or allowing Lauer to value, nearly worthless holdings in shell corporations and other holdings at exorbitant amounts in violation of the PPMs and other agreements and applicable law;

(d)     siphoning money from the Funds through consultants' fees paid to third parties for their own financial benefit; and

(e)     employing incompetent and/or corrupt consultants, valuation shills, and stock brokers to assist them in carrying out these activities.

374.    Lauer's, Garvey's, Hauser's and Raker's actions proximately caused the Funds to suffer substantial damages, including:

(a)     The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)     The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by various of the Defendants herein;

(c)     The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)     The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)     The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays that a judgment be entered against Lauer, Garvey, Hauser and Raker for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and, (c) for such other relief as the Court deems just and proper.

## COUNT III

### (Aiding And Abetting Breach of Fiduciary Duty -- All Defendants)

375.    The Receiver incorporates the allegations contained in paragraphs 1 through 374 as if fully stated herein.

376.    As officers, directors, and/or controlling persons of the Funds, Lauer, Garvey, Hauser, and Raker each owed Fiduciary Duties to the Funds, including:

(a)     a duty to invest in securities for the Funds in accordance with the Funds' stated investment goals;

(b)     a duty to fairly value the securities of the Funds;

(c)     a duty not to act in their own interests to the detriment of the Funds;

(d)     a duty not to usurp business opportunities of the Funds; and

- 68 -

(e)     a general duty of care to act prudently and in the best interests of the Funds.

377.    As noted above, Lauer, Garvey, Hauser and Raker breached the Fiduciary Duties owed to the Funds.

378.    All of the Defendants had actual or constructive knowledge of breaches of Fiduciary Duties that Lauer, Garvey, Hauser, and Raker owed to the Funds.

379.    All of the Defendants deliberately assisted and/or encouraged Lauer, Garvey, Hauser, and Raker with respect to the breaches of Fiduciary Duties. For example:

(a)     the Officers, Directors and Employees (Lauer, Garvery, Hauser, Raker and Newman), among other things, distributed false information to investors and service providers of the Funds; helped Lauer select the Lancer Controlled Shells; executed sham trades directed by Lauer; and generally assisted Lauer in manipulating the Funds' NAV's.

(b)     the Market Makers (Shamrock, Kelly and Huard), among other things, helped Lauer manipulate the price of the Lancer Controlled Shells in the public markets;

(c)     the Appraisers (Barbarosh, Levie and Stenton Leigh), among other things, provided Lauer with artificially high appraisals of the Lancer Controlled Shells;

(d)     the Consultants (Braithewaite, Sterling, Isaacson, LII, Thornhill, Maum, Raker and Capital Research), among other things, helped Lauer "find" the Lancer Controlled Shells and often held a management position with the Lancer Controlled Shell to provide Lauer the continued means to use the shell to manipulate the Funds' NAV's; and

(e)     Carens, among other things, helped Lauer secrete away assets from the Funds.

380.   All of the Defendants benefited monetarily from the aid and assistance they provided to the breaches of Fiduciary Duties by Lauer, Garvey, Hauser, and Raker. These monetary benefits included payments for alleged "consulting," payments for alleged "services," payments for "referral" or "finders' fees, the receipt of free shares of stock in portfolio companies of the Funds, payment of unearned salary or other compensation, continued business relationships with the Funds, payments as directors or officers of portfolio companies, the payment of personal expenses from monies that were wrongfully diverted from the Funds, and other forms of compensation.

381.   The Defendants provided little or no value to the Funds in exchange for payments or other things of value they received from the Funds.

382.   Because they aided and abetted the breaches of Fiduciary Duties by Lauer, Garvey, Hauser, and Raker, the Defendants are equally liable for those breaches.

383.   The Defendants' actions proximately caused the Funds to suffer substantial damages, including:

(a)   The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)   The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by various of the Defendants herein;

(c)   The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)   The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)     The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays that a judgment be entered against jointly and severally against all of the Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and (c) for such other relief as the Court deems just and proper.

## COUNT IV

### (Unjust Enrichment -- All Defendants)

384.    The Receiver incorporates the allegations contained in paragraphs 1 through 383 as if fully stated herein.

385.    The Funds conferred substantial benefits on the Defendants from at least December, 1997 through July 10, 2003. During this period of time, the Defendants regularly received – either directly or indirectly – compensation, distributions, stock, payments, or other things of value from the Funds for little or no consideration.

386.    The Defendants either requested these benefits or knowingly and voluntarily accepted and retained them, and a benefit flowed to the Defendants as a result.

387.    It would be unjust and inequitable under the circumstances to allow the Defendants to retain the property they received from the Funds when the Defendant's actions proximately caused the Funds to suffer substantial damages, including:

(a)     The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)      The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by various of the Defendants herein;

(c)      The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)      The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)      The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays for judgment against all of the Defendants for (a) compensatory and punitive damages, plus interest, fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and, (c) for such other relief as the Court deems just and proper.

## COUNT V

**(Professional Malpractice -- Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Stenton Leigh, Levie, Isaacson, LII, and Thornhill)**

388.    The Receiver incorporates the allegations contained in paragraphs 1 through 387 as if fully stated herein.

389.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all purported to provide professional services to the Funds.

390.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all owed a duty of professional care to the Funds.

391.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all negligently, recklessly or knowingly breached their duty of professional care by aiding and abetting Lauer, Garvey, Hauser and Raker's breaches of their Fiduciary Futies, by providing unreasonable investment advice, by providing incompetent consulting, investment, and valuation services, and by exploiting the Funds for their own personal gain.

392.    The breaches of professional care by Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill proximately caused the Funds' hopeless insolvency and eventual collapse.

393.    The professional malpractice by Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill proximately caused the Funds to suffer substantial damages, including:

(a)    The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)    The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by various of the Defendants herein;

(c)    The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)    The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)      The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays for judgment against Defendants Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill for (a) compensatory and punitive damages, plus interest, fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and, (c) for such other relief as the Court deems just and proper.

<u>**COUNT VI**</u>

**(Breach Of Contract -- Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Stenton Leigh, Levie, Isaacson, LII, and Thornhill)**

394.    The Receiver incorporates the allegations contained in paragraphs 1 through 393 as if fully stated herein.

395.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all agreed to provide services for the Funds pursuant to express oral and/or written contracts with the Funds.

396.    Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill all failed to perform as obligated under their contracts with the Funds by aiding and abetting Lauer, Garvey, and Hauser's breaches of their fiduciary duties, by providing unreasonable investment advice, by providing incompetent consulting, investment, and valuation services, and by exploiting the Funds for their own personal gain.

397.    The breaches of contract by Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill caused the Funds to suffer

substantial damages, including:

(a)     The Funds were depleted by paying tens of millions of dollars in management and incentive fees to Lauer, Garvey and Hauser based on inflated NAV's;

(b)     The Funds were depleted by paying millions, and perhaps tens of millions, of dollars of fees for bogus services provided by the Co-Defendants herein;

(c)     The Funds were depleted by making continuing "investments' in various portfolio companies that did not have significant earnings or reasonable prospects for such earnings;

(d)     The Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated based on inflated and erroneous NAV's; and

(e)     The Funds were able to remain in operation, incur obligations and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt to that Funds are unable to pay.

**WHEREFORE**, the Receiver prays for judgment against Capital Research, Sterling, Kelly, Shamrock, Barbarosh, Levie, Isaacson, LII, Stenton Leigh, and Thornhill for (a) compensatory and punitive damages, plus interest, fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and, (c) for such other relief as the Court deems just and proper.

**COUNT VII**

**(Breach of ERISA Fiduciary Duties -- Lauer, Garvey, Hauser, and Raker)**

398.    The Receiver incorporates the allegations contained in paragraphs 1 through 397 as if fully stated herein.

399.    The investors in Offshore include certain "benefit plan investors" as defined under 29 C.F.R. § 2510.3-101(f), which include most benefit and retirement plans and certain accounts whether or not subject to ERISA, including individual retirement accounts and foreign benefit plans.

400.    The equity interests of such benefit plan investors in Offshore was approximately 30.18% as of December 31, 2000; 31.15% as of December 31, 2001; and 31.36% as of December 31, 2002.

401.    The benefit plan investors in Offshore include plans that are subject to ERISA, including, but not limited to, the following: Bombardier Corp. Retirement Plan (U.S.); Hunnicutt & Co. Inc. Defined Benefit Plan; Dominion Resources Inc. Retirement Plan; Weyerhaeuser Company Master Retirement Trust; and Wyatt Incorporated Employees Profit Sharing Plan.

402.    Because the equity interests of benefit plan investor in Offshore has exceeded the 25% threshold under 29 C.F.R. § 2510.3-101(f), and because the benefit plan investors includes ERISA employee benefit plans, the assets of such ERISA plans include an undivided interest in each of Offshore's underlying assets, pursuant to ERISA's "plan asset" definition under 29 C.F.R. § 2510.3-101(a)(2). Thus, the assets of Offshore constitute "plan assets" under ERISA.

403.    Any person who exercises authority or control respecting the management or disposition of the assets of Offshore, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) or has authority or responsibility to do so, is a fiduciary under ERISA, pursuant to 29 U.S.C. § 1002(21) (ERISA § 3(21)), and 29 C.F.R. § 2510.3-101(a)(2).

404.    As the court-appointed receiver for Offshore, the Receiver has authority or control respecting the management or disposition of Offshore's assets and, to that extent, is an ERISA fiduciary, pursuant to 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)).

405.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is authorized under 29 U.S.C. § 1132(a)(2) (ERISA § 502(a)(2)) to bring a civil action for appropriate relief under 29 U.S.C. § 1109 (ERISA § 409), which requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . .." Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . .."

406.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is authorized under 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) to bring a civil action to enjoin any act or practice which violates any provision of Title I of ERISA, or to obtain other appropriate equitable relief to redress such violations or to enforce any provision of Title I of ERISA.

407.    When the equity interests of benefit plan investors in Offshore exceeded the 25% threshold under 29 C.F.R. § 2510.3-101(f), the assets of Offshore became subject to ERISA, regardless of any statement or acknowledgement by Offshore or any other person or investor, or any provision in any document or agreement, that it was the intention to limit such benefit plan investor's equity interest to less than 25%.

408.    Lauer, Garvey, Hauser, and Raker exercised authority or control respecting the management or disposition of the Offshore assets. As such, Lauer, Garvey, and Hauser were ERISA fiduciaries, pursuant to 29 U.S.C. § 1002(21)(A)(i) (ERISA § 3(21)(A)(i)).

409.    Lauer, Garvey, Hauser, and Raker rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets, through their authority and/or contractual responsibility to fairly and properly calculate Offshore's NAV/share.  To this extent, Lauer, Garvey, and Hauser were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

410.    Lauer, Garvey, Hauser, and Raker provided investment advice to Offshore's ERISA plan assets for a fee (direct or indirect), or had authority or responsibility to do so.  To this extent, Lauer, Garvey, and Hauser were also ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

411.    As ERISA fiduciaries, Lauer, Garvey, Hauser, and Raker were prohibited under 29 U.S.C. § 1106(b) (ERISA § 406(b)) from self-dealing with respect to Offshore's ERISA plan.

412.    As ERISA fiduciaries, Lauer, Garvey, Hauser, and Raker were obligated to discharge their duties with respect to ERISA plans invested in Offshore: (i) solely in the interest of the beneficiaries of the ERISA plans; (ii) for the exclusive purpose of providing benefits to the beneficiaries of the ERISA plans and defraying reasonable plan administration expenses; (iii) with the care, skill, prudence and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (iv) by diversifying the investments of the ERISA plans invested in Offshore so as to minimize the risk of large losses, unless under the circumstances it was clearly prudent not to do so; and (v) in accordance with the documents and instruments governing the plan.

413.    Lauer, Garvey, Hauser, and Raker breached their respective fiduciary duties to the ERISA pension plans invested in Offshore by, among other things: (i) self dealing; (ii) acting solely in their own interests, rather than in the best interests of the ERISA pension plans or the Funds; (iii) failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use; (iv) failing to diversify the investments of the plan so as to minimize the risk of large losses; and (v) failing to act in accordance with the instruments governing the plan, including, among other things, the Partnership Agreement; the Offshore Articles; the Omnifund Articles; and the stated investment strategies contained in the Offshore PPM and Partners PPM.

414.    The actions of Lauer, Garvey, Hauser, and Raker resulted in grossly exaggerated valuations for Offshore, and an artificially prolonged insolvent existence, both of which significantly depleted the value of the ERISA plans invested in Offshore.

415.    The Receiver is entitled to relief from Lauer, Garvey, Hauser, and Raker in the form of: (i) a monetary payment to Offshore to reimburse it for the losses incurred or profits received with respect to the plan assets resulting from the breaches of fiduciary duties alleged above, as required by 29 U.S.C. § 1109(a) (ERISA § 409(a)); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) (ERISA §§ 409(a) and 502(a)(2) and (3)); and (iii) reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g) (ERISA § 502(g)), and other applicable law.

**WHEREFORE**, the Receiver prays that a judgment be entered against Defendants Lauer, Garvey, Hauser, and Raker for: (a) damages, plus interest, attorney's fees, and costs; (b) a declaration that Lauer, Garvey, and Hauser are precluded from receiving any distribution from

the Receivership Estate; and, (c) any such other and further relief the Court deems equitable and just.

## COUNT VIII

### (Liability As ERISA Co-Fiduciaries -- Lauer, Garvey, Hauser, and Raker)

416.    The Receiver incorporates the allegations contained in paragraphs 1 through 415 as if fully stated herein.

417.    Lauer, Garvey, Hauser, and Raker were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2), and Raker was ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

418.    Lauer, Garvey, Hauser, and Raker (the "ERISA Co-Fiduciaries") and each of them: (i) knowingly participated in, or knowingly undertook to conceal violations of fiduciary duties that their ERISA Co-Fiduciaries owed the ERISA pension plans invested in Offshore; (ii) enabled, through failure to comply with their own fiduciary obligations, their other ERISA Co-Fiduciaries to commit these breaches; and/or (iii) had knowledge of their ERISA Co-Fiduciaries' breaches.

419.    The ERISA Co-Fiduciaries knowingly, recklessly, or with gross negligence breached their fiduciary duties to the ERISA pension plans invested in Offshore by aiding each other's fiduciary breaches, and by helping their ERISA Co-Fiduciaries to manipulate Offshore's stated NAV.

420.    As ERISA Co-Fiduciaries, Lauer, Garvey, Hauser, and Raker are liable for one another's ERISA fiduciary breaches, because they knowingly and deliberately aided and abetted one another to commit those breaches.

421.    Alternatively, the ERISA Co-Fiduciaries had actual or constructive knowledge of each others' breaches, but failed to make reasonable efforts under the circumstances to remedy them.

422.    The Receiver is entitled to relief from the ERISA Co-Fiduciaries in the form of: (i) a monetary payment to Offshore to reimburse it for the losses incurred or profits received with respect to the plan assets resulting from the breaches of fiduciary duties alleged above, including profits received by the ERISA Co-Fiduciaries; (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above; and (iii) reasonable attorneys' fees and expenses.

**WHEREFORE**, the Receiver prays that a judgment be entered against Defendants Lauer, Garvey, Hauser, and Raker for: (a) damages, plus interest, attorney's fees, and costs; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; and, (c) for such other relief as the Court deems just and proper.

## COUNT IX

### (Equitable Restitution Under ERISA §§ 502(a)(3) and 502(l) -- All Defendants)

423.    The Receiver incorporates the allegations contained in paragraphs 1 through 422 and 439 through 455 as if fully stated herein.

424.    Under §§ 502(a)(3) and 502(l)), 29 U.S.C.A. § 1132(a)(3), a civil action for restitution and other appropriate equitable relief may be brought against a non-fiduciary by an ERISA participant, beneficiary, or fiduciary (in this case the Receiver), to redress ERISA violations or to enforce any ERISA provisions.

425.    The Defendants knowingly participated in the ERISA fiduciaries' breaches of substantive provisions of ERISA.

426.   The Defendants are transferees of ERISA assets which ultimately belong to the ERISA pension plans invested in Offshore.

427.   The Defendants received and/or remain in possession of ERISA assets which ultimately belong to the ERISA pension plans invested in Offshore.

428.   The Defendants had actual or constructive knowledge of the circumstances that render their possession of these asset wrongful.

**WHEREFORE**, the Receiver prays for a final judgment against the Defendants for: (a) a declaration requiring each of them to disgorge themselves of all Fund assets still in their possession, custody, or control; (b) a declaration that the Defendants to this action and any other complicit third parties are precluded from receiving any distribution from the estates of the Receivership Entities and the bankruptcy estate of Partners; (c) a declaration requiring each of these Defendants to make equitable restitution to the Funds' investors in an amount equal to the sum total of Fund assets wrongfully transferred to them by ERISA fiduciaries; (d) interest, attorney's fees, and costs on such payments; and, (e) for such other relief as the Court deems just and proper.

**HUNTON & WILLIAMS LLP**
*Counsel for the Receiver*
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
305-810-2500
305-810-2460 (fax)

By:_____
Andrew D. Zaron
Florida Bar No. 965790
James J. Thornton
Florida Bar No. 323070